# EXHIBIT 1



**GIRARD GIBBS LLP**
Daniel C. Girard (SBN 114826)
dcg@girardgibbs.com
Scott M. Grzenczyk (SBN 279309)
smg@girardgibbs.com
601 California Street, 14th Floor
San Francisco, California 94108
Tel:   415-981-4800
Fax:   415-981-4846

**MILLER SCHIRGER, LLC**
John J. Schirger (*pro hac vice forthcoming*)
jschirger@millerschirger.com
Matthew W. Lytle (*pro hac vice forthcoming*)
mlytle@millerschirger.com
Joseph M. Feierabend (*pro hac vice forthcoming*)
jfeierabend@millerschirger.com
4520 Main Street, Suite 1570
Kansas City, Missouri 64111
Tel:   816-561-6500
Fax:   816-561-6501

**STUEVE SIEGEL HANSON LLP**
Patrick J. Stueve (pro hac vice to be filed)
stueve@stuevesiegel.com
Norman E. Siegel (pro hac vice to be filed)
siegel@stuevesiegel.com
Bradley T. Wilders (pro hac vice to be filed)
wilders@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel:   816-714-7100
Fax:   816-714-7101

ENDORSED
FILED
ALAMEDA COUNTY

APR 29 2016

CLERK OF THE SUPERIOR COURT
By _____
Deputy

ATTORNEYS FOR PLAINTIFF

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

BARBARA LARSON, Individually and On
Behalf Of All Others Similarly Situated,

      Plaintiff,

      vs.

JOHN HANCOCK LIFE INSURANCE
COMPANY (U.S.A.),

      Defendant

Case No.   RG16813803

**CLASS ACTION**

CLASS ACTION COMPLAINT FOR:

1. BREACH OF CONTRACT; and
2. DECLARATORY AND INJUNCTIVE
   RELIEF

DEMAND FOR JURY TRIAL



---

CLASS ACTION COMPLAINT

Plaintiff Barbara Larson ("Plaintiff"), individually and on behalf of all others similarly situated, for her Class Action Complaint against Defendant John Hancock Life Insurance Company (U.S.A) ("Defendant"), states and alleges as follows:

## INTRODUCTION

1.     This is a class action for breach of contract to recover amounts that Defendant has charged and collected from Plaintiff and members of a class of life insurance policy owners in excess of amounts authorized by the express terms of their policies.

2.     The terms of Plaintiff's life insurance policy provide for an "Account Value" consisting of monies held in trust by Defendant for Plaintiff. Over the course of several years, Defendant has systematically deducted monies from Plaintiff's "Account Value" and those of the proposed class in breach of policy terms.

3.     Defendant is contractually bound to deduct only those charges that are explicitly identified and authorized by the terms of its life insurance policies. Despite unambiguous policy language in a fully integrated agreement, Defendant deducts charges from policy Account Values of Plaintiff and the proposed class of policy owners in excess of the amounts specifically permitted by their policies, and Defendant's unauthorized deductions are continuing in nature.

4.     Defendant has caused material harm to Plaintiff and other policy owners by improperly draining monies they have accumulated in the Account Values of their policies. Every unauthorized dollar taken from policy owners is one less dollar that can be used to: invest through the policy; pay future premiums; increase the death benefit; use as collateral for policy loans; or withdraw as cash.

5.     Plaintiff brings this case as a class action under California Code of Civil Procedure § 382, on behalf of herself and as a representative of the following persons (the "Class"):

> All persons who own or owned a life insurance policy, that is a security, issued or administered by Defendant, or its predecessors in interest, the terms of which provide or provided for: 1) an insurance or cost of insurance charge or deduction calculated using a rate that is based on Defendant's future mortality expectations,

including its "expectations of future mortality experience;" 2) additional but separate policy charges, deductions, or expenses; 3) an investment, interest-bearing, or savings component; and 4) a death benefit.

## PARTIES

6.      Plaintiff Barbara Larson is an individual and resident of the State of California.

7.      Defendant John Hancock Life Insurance Company (U.S.A) is a life insurance company organized and existing under the laws of the State of Michigan, and maintains its principal place of business in Boston, Massachusetts.

## JURISDICTION AND VENUE

8.      Pursuant to Cal. Civ. Proc. Code § 410.10, personal jurisdiction exists over the Defendant here because it conducted business in the State of California ("State") by entering into the Policy with Plaintiff in the State of California.

9.      There is no federal question jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims assert no federal question or federal statute violation.  In addition, there is no federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the Class has been defined to include citizens of Massachusetts and/or Michigan and Defendant is a citizen of Massachusetts and/or Michigan.  Moreover, there is no federal diversity jurisdiction under 28 U.S.C. § 1332(d)(2) because this action solely involves claims: concerning covered securities; or that relate to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to a security, and is therefore excepted from federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(d)(9).  This action is therefore not removable to federal court. *See Lincoln Nat'l. Life Ins. Co. v. Bezich*, 610 F.3d 448 (7th Cir. 2010); *see also Eminence Inv'rs, L.L.L.P. v. Bank of New York Mellon*, 782 F.3d 504, 507 (9th Cir. 2015).

10.      Venue is proper in this County pursuant to Cal. Civ. Proc. Code § 395 because Defendant is not a resident of the State and its principal place of business and principal office are located in Boston, Massachusetts.  On information and belief, Defendant has not designated a principal office in the State pursuant to Cal. Corp. Code § 2105(a)(3).  Moreover, to the extent applicable, venue is also proper under Cal. Civ. Proc. Code § 395.5.  On information and belief,

Defendant sells and has sold Class Policies in this County and performs and has performed Class Policies in this County. It also maintains a presence in this County by establishing agents to sell and administer its life insurance products in this County.

## GENERAL ALLEGATIONS

11.     Plaintiff purchased from John Hancock Variable Life Insurance Company, Defendant's predecessor in interest, a "Flex V Scheduled Premium Variable Whole Life" policy bearing the policy number FV 3369489 and a date of issue of May 9, 2000, with an initial face amount of $50,000 (the "Policy"). A true and accurate copy of the Policy is attached hereto as Exhibit A, and incorporated herein by reference.

12.     Plaintiff has always been both the "owner" and the "insured" under the Policy, which remains in force.

13.     At some time after issuing the Policy to Plaintiff, John Hancock Variable Life Insurance Company merged with John Hancock Life Insurance Company into Defendant John Hancock Life Insurance Company (U.S.A) and, as a result, Defendant is the effective and liable insurer of the Policy.

14.     The Policy is a valid and enforceable contract between Plaintiff and Defendant.

15.     The entire contract between Plaintiff and Defendant consists of the Policy and the application. Ex. A at p. 16.

16.     The terms of the Policy are not subject to individual negotiation and are materially the same for all policyholders. They cannot be altered by an agent's representations at the time of sale, or by any other discussions or writings.

17.     Only the President, Vice President, Secretary, or an Assistant Secretary of Defendant has authority to waive or agree to change in any respect any of the conditions or provisions of the Policy. See Ex. A at p. 16.

18.     Defendant has issued and administered, and currently administers, all aspects of the Policy, and has issued and/or administered the policies meeting the class definition set forth in Paragraph 2 above (the "Class Policies"), including collecting premiums, and setting, assessing and deducting policy charges.

CLASS ACTION COMPLAINT

19.     The Policy and Class Policies are life insurance policies that, unlike standard term life insurance policies, provide policyholders an investment, savings, or interest-bearing component ("savings component"), in addition to a death benefit.

20.     Generally speaking, under life insurance policies like the Policy and Class Policies, policyholders contribute premium dollars that are deposited into the savings component and the insurer deducts monthly charges therefrom as authorized by the policy.  The savings component may consist of one or more types of investment accounts, including variable mutual fund-type investment accounts or an interest bearing account that accumulates over time.

21.     The savings component of the Policy is called the "Account Value."  Although the savings component in other policy forms included in the Class Policies may be identified by a name other than the "Account Value," such as "Accumulation Value," "Cash Value," or some other name, for purposes of this Class Action Complaint, the savings component of all Class Policies will be referred to as the "Account Value."

22.     On Plaintiff's Policy, the identifiable sums of money are held in a "Separate Account" (a securities investment) and a "Fixed Account" (an interest bearing savings account).

23.     Defendant may access and withdraw monies from the Account Value only as expressly authorized by the Policy and the Class Policies.

24.     The Policy and Class Policies expressly define the specific charges that Defendant may assess and deduct from a given policyholder's premium payments and the accumulated Account Value.  Defendant may deduct only those charges allowed by the Policy and Class Policies.

25.     The Policy authorizes Defendant to take the following "Current Deductions" from Plaintiff's Account Value:

> a.  the Maintenance Charge;
>
> b.  the Guaranteed Death Benefit Charge, if applicable;
>
> c.  the sum of all charges for Riders which are part of the Policy, if applicable;
>
> d.  the sum of all charges for ratings, if applicable;
>
> e.  the Issue Charge; and

f.    the Insurance Charge.

Ex. A at p. 3A, 8.

26.    The Policy authorizes Defendant to take certain of these Current Deductions from Plaintiff's Account Value in the following fixed amounts: an Issue Charge of $20.00 per month for the first twelve months the Policy is in-force; a Maintenance Charge of $6.00 per month; and a Guaranteed Death Benefit Charge of $0.50 per month.  Ex. A at p. 3A.

27.    Although the Policy authorizes Defendant to change these amounts, Defendant is not authorized to take Current Deductions in amounts that exceed the following maximums: $20.00 per month for the Issue Charge; $8.00 per month for the Maintenance Charge; and $1.50 per month for the Guaranteed Death Benefit Charge.  Ex. A at p. 3B.

28.    In addition to setting the current and maximum fixed amounts of Current Deductions, the Policy expressly defines how the "Insurance Charge" is calculated:

> The Insurance Charge on the Date of Issue or on any Processing Date is an amount equal to the applicable Applied Monthly Rate multiplied by the Net Amount at Risk on such Date of Issue or the Processing Date.  Each Insurance Charge is deducted in advance of the insurance coverage to which it applies.

Ex. A at p. 8.

29.    The Policy explicitly authorizes Defendant to use only its "expectations of future mortality experience" when determining the Applied Monthly Rate used to calculate the Insurance Charge that is deducted from Plaintiff's Account Value each month:

> The Applied Monthly Rates are the actual rates used to calculate Insurance Charges.  We will determine the Applied Monthly Rates to be used for this policy. They will not exceed the Maximum Monthly Rates shown in the applicable Table of Rates in Section 2.  The Applied Monthly Rates will be based on our expectations of future mortality experience.  They will be reviewed at least once every 5 policy years.  Any change in Applied Monthly Rates will be made on a uniform basis for insureds of the same sex, Issue Age, and premium class,

including smoker status, and whose policies have been in force for the same length of time.

Ex. A at p. 8.

30.     Like the Policy, the Class Policies disclose similar periodic deductions that Defendant is authorized to take from policyholder Account Values including, specifically, insurance or cost of insurance charges that are calculated using rates that Defendant must determine "based on" its future mortality expectations, including its "expectations of future mortality experience" ("Mortality-Based Rates"), and separate maintenance, administrative, or expense charges or deductions in fixed amounts.

31.     Although the Policy and Class Policies authorize Defendant to use only its future mortality expectations, including its "expectations of future mortality experience," Defendant uses other factors, not authorized by the Policy and Class Policies, when determining Applied Monthly Rates for the Policy and Mortality-Based Rates for the Class Policies, including, without limitation:

     a.  Expense experience;

     b.  Persistency;

     c.  Taxes;

     d.  Profit assumptions;

     e.  Investment Earnings;

     f.  Capital and reserve requirements, and

     g.  Other unspecified factors.

32.     By including these other factors in calculating Applied Monthly Rates and Mortality-Based Rates, Defendant knowingly causes those rates to be higher than what is explicitly authorized by the Policy and Class Policies.

33.     The higher Applied Monthly Rates used by Defendant cause the Insurance Charges to be greater than what is explicitly authorized by the Policy.  Consequently, Defendant withdraws from the Account Value an amount for the Insurance Charge that is greater than what the Policy authorizes.

CLASS ACTION COMPLAINT

34.     Likewise, under the Class Policies, the higher Mortality-Based Rates used by Defendant cause the insurance or cost of insurance charges to be greater than what is explicitly authorized by the Class Policies.  Consequently, Defendant withdraws from the Account Value an amount that is greater than what the Class Policies authorize.

35.     If Defendant wanted authorization to use factors other than its "expectations of future mortality experience" to determine Applied Monthly Rates on the Policy and Mortality-Based Rates on the Class Policies, Defendant could and should have listed all the factors it used to determine those rates.  Defendant knows how to obtain such authorization because it has done so with other policies not included in the class.  For instance, Defendant's Majestic Performance VUL Policy includes a "Cost of Insurance Charge" that is "based on" not only "[Defendant's] expectations of future mortality," but also "persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions."  Exhibit B at p. 12.

36.     By loading Applied Monthly Rates and Mortality-Based Rates with unauthorized factors, Defendant repeatedly and continuously breaches the Policy and Class Policies by impermissibly inflating those rates such that they substantially exceed Defendant's future mortality expectations, including its "expectations of future mortality experience."

37.     As a direct and proximate result of Defendant's breaches, Plaintiff and the Class have been damaged and those damages are continuing in nature in that Defendant has deducted and will deduct charges from the Account Values of Plaintiff and the Class in amounts not authorized by the Policy or Class Policies.

38.     By loading Applied Monthly Rates and Mortality-Based Rates with undisclosed maintenance, administrative, and other expense factors, Defendant repeatedly and continuously breaches the Policy and Class Policies by impermissibly deducting amounts from the Account Values of Plaintiff and the Class in excess of the fixed and maximum expense amounts expressly authorized by the Policy and Class Policies.

39.     As a direct and proximate result of Defendant's breaches, Plaintiff and the Class have been damaged and those damages are continuing in nature in that Defendant has deducted

CLASS ACTION COMPLAINT

and will continue to deduct maintenance, administrative, and other expenses from the Account Values of Plaintiff and the Class in amounts not authorized by the Policy and Class Policies.

40.     The nature of Defendant's conduct is such that Plaintiff and each member of the Class would be unaware that Defendant was engaging in wrongdoing by taking inflated charges and improper amounts from Account Values.  Defendant possesses the actuarial information and equations underlying computation of rates and charges for the Policy and Class Policies.  The Applied Monthly Rates actually used to calculate the monthly Insurance Charges, and Mortality-Based Rates actually used to calculate the monthly insurance and cost of insurance charges under the Class Policies, are not disclosed to policy owners, nor are the components or factors that comprise those rates.  And, even if they were, the Plaintiff and members of the Class would lack the knowledge, experience, or training to reasonably ascertain how the Defendant calculated the rates and charges included in the Policy and Class Policies.

41.     Defendant was aware of its non-disclosure because of its superior knowledge of the aforementioned computations.  Concealment of its conduct and failure to disclose its conduct to the Plaintiff or the Class constitutes fraudulent concealment and therefore tolls the statute of limitations for Plaintiff and the members of the Class.  Plaintiff did not learn of Defendant's breaches of the Policy until after July 18, 2012, when she engaged counsel and consulted an actuarial expert.  Plaintiff was not at fault for failing to discover the breaches and had no actual or presumptive knowledge of the breaches.

42.     Plaintiff did not learn of Defendant's breaches of her Policy because the facts showing breach were not reasonably discoverable by Plaintiff nor was the harm that was caused by Defendant's breaches.

## CLASS ALLEGATIONS

43.     Plaintiff brings this case as a class action under California Code of Civil Procedure § 382, on behalf of herself and as a representative of the following Class:

> All persons who own or owned a life insurance policy, that is a security, issued or administered by Defendant, or its predecessors in interest, the terms of which provide or provided for: 1) an insurance or cost of insurance charge or deduction

calculated using a rate that is based on Defendant's future mortality expectations, including its "expectations of future mortality experience;" 2) additional but separate policy charges, deductions, or expenses; 3) an investment, interest-bearing, or savings component; and 4) a death benefit.

Excluded from the Class is the Defendant, any entity in which the Defendant has a controlling interest, any of the officers, directors, or employees of the Defendant, the legal representatives, heirs, successors, and assigns of the Defendant, anyone employed with Plaintiff's counsel's firms, and any Judge to whom this case is assigned, and his or her immediate family. Excluded from the Class is any policy that explicitly discloses all of the factors Defendant used to calculate its rates and charges.

44.     The Class satisfies the ascertainability, numerosity, and well defined community of interest requirements of a class action under California Code of Civil Procedure § 382, as set forth more fully herein.

45.     The class definition provides a reasonable means of identifying Class members and therefore satisfies the ascertainability requirement.

46.     The persons who fall within the Class number in at least the hundreds and most likely thousands, and thus the issue in this case is one of a common or general interest of many persons and the Class members are so numerous and geographically dispersed across the country that it is impracticable to bring them all before the court, satisfying the numerosity requirement. Class members may be informed of the pendency of this class action through direct mail.

47.     The Class represents a well-defined community of interest in that (1) common questions of law or fact predominate; (2) Plaintiff's claims are typical of the Class; and (3) Plaintiff will adequately represent the Class, as set forth below.

48.     There are questions of fact and law common to the Class that predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendant's actions include, without limitation, the following:

a. Whether Defendant is permitted by Class Policies to use factors other than those disclosed in the Class Policies to determine rates, such as the Applied Monthly Rates, used to calculate insurance policy deductions;

b. Whether Defendant used factors not specified in the Class Policies to determine rates, such as the Applied Monthly Rates, used to calculate insurance and cost of insurance charges or deductions;

c. Whether Defendant added or included factors not specified in the Class Policies to determine rates, such as the Applied Monthly Rates, used to calculate insurance and cost of insurance charges;

d. Whether Defendant added or included factors unrelated to its future mortality expectations, including its "expectations of future mortality experience," to set and determine rates that the Class Policies provide are "based on" Defendant's future mortality expectations, including its "expectations of future mortality experience," and no other disclosed factors;

e. Whether Defendant charged amounts in excess of those specifically authorized by the Class Policies;

f. Whether Defendant breached the express and/or implied terms of the Class Policies;

g. Whether the Class sustained damages as a result of Defendant's breaches of contract;

h. Whether the Class is entitled to damages, restitution, and/or other equitable relief as a remedy for Defendant's breaches of contract;

i. Whether the Class, or some subset of the Class, is entitled to injunctive relief requiring Defendant to make its deductions from Account Values in accordance with the terms of the Class Policies in the future; and

j. Whether the Class, or some subset of the Class, is entitled to declaratory relief stating the proper construction and/or interpretation of the Class Policies.

49. The questions set forth above predominate over any questions affecting only individual persons, and a class action will result in substantial benefits to the litigants and the Court with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein.

50. Plaintiff's claims are typical of those of the Class in that Class members purchased policies containing the same or similar limitations on the amounts that Defendant could charge its policyholders under the express terms of the Policy and Class Policies.

51. A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendant has acted or refused to act on grounds generally applicable to the Class. The presentation of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests.

52. Plaintiff is an adequate representative of the Class because she is a member of the Class and her interests do not conflict with the interests of those she seeks to represent. The interests of the Class members will be fairly and adequately protected by Plaintiff and her counsel, who have extensive experience prosecuting complex class litigation, including claims involving similar conduct to that alleged here.

53. Maintenance of this action as a class action is a fair and efficient method for adjudicating this controversy, and denial of class relief will result in unjust advantage to Defendant. It would be impracticable and undesirable for each member of the Class who suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Class members.

## FIRST CAUSE OF ACTION

### (Breach of Contract - Applied Monthly Rate and Mortality-Based Rate Provisions)

54.  Plaintiff incorporates and restates by reference all of the preceding allegations as though fully set forth herein.

55.  Plaintiff and the Class purchased life insurance policies—the Policy and Class Policies—from Defendant.

56.  The Policy and Class Policies are valid and enforceable contracts between Plaintiff and the Class members and Defendant.

57.  Plaintiff and the Class members substantially performed their obligations under the terms of the Policy and Class Policies.

58.  By using unauthorized and undisclosed factors to compute the Applied Monthly Rates and Mortality-Based Rates, Defendant impermissibly increased Applied Monthly Rates for the Policy and Mortality-Based Rates for the Class Policies.

59.  Because Applied Monthly Rates are used to calculate the Insurance Charge under the Policy, and because similar Mortality-Based Rates are used to calculate insurance charges under Class Policies, Defendant has deducted and will deduct unauthorized charges from the Account Values of Plaintiff and the Class.

60.  Defendant's practice of deducting charges in amounts not authorized by the Policy and Class Policies constitutes a breach of the policies.

61.  As a direct and proximate result of Defendant's breach, Plaintiff and the Class have been damaged, and these damages are continuing in nature.

## SECOND CAUSE OF ACTION

### (Breach of Contract - Maintenance and/or Expense Charge Provisions)

62.  Plaintiff incorporates and restates by reference all of the preceding allegations as though fully set forth herein.

63.  By inflating Applied Monthly Rates under the Policy, and Mortality-Based Rates under the Class Policies, with maintenance, administrative, and other expense factors that are not disclosed as being used to determine those rates, Defendant

impermissibly deducted maintenance, administrative, and other expenses from the Account Values of Plaintiff and the Class in amounts in excess of the fixed and maximum amounts expressly authorized by the Policy and Class Policies.

64. Defendant's practice of deducting maintenance, administrative, and other expenses from the Account Values of Plaintiff and the Class in amounts in excess of the fixed and maximum amounts expressly authorized by the Policy and Class Policies, constitutes a breach of the policies.

65. As direct and proximate result of Defendant's breach, Plaintiff and the Class have been damaged and these damages are continuing in nature.

## THIRD CAUSE OF ACTION

### (Breach of Contract - Expectations of Future Mortality Experience Provisions)

66. Plaintiff incorporates and restates by reference all of the preceding allegations as though fully set forth herein.

67. The Policy and Class Policies require Defendant to set the Applied Monthly Rates and Mortality-Based Rates using Defendant's future mortality expectations, including its "expectations of future mortality experience." Further, the Policy and Class Policies require Defendant to evaluate its future mortality expectations periodically – in the case of the Policy, every five years.

68. Although mortality expectations have generally improved because people are living longer today than when the Policy or Class Policies were initially priced, Defendant has, on information and belief, failed to lower its Applied Monthly Rates for Plaintiff's Policy or its Mortality-Based Rates for the Class Policies.

69. Defendant's failure to lower these rates even though its expectations of future mortality experience improved constitutes a breach.

70. As a direct and proximate result of Defendant's breach, Plaintiff and the Class have been damaged and those damages are continuing in nature.

## FOURTH CAUSE OF ACTION

### (Declaratory and Injunctive Relief)

71. Plaintiff incorporates and restates by reference all of the preceding allegations as though fully set forth herein.

72. An actual controversy has arisen and now exists between Plaintiff and the Class Members, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policy and Class Policies.

73. Plaintiff contends that Defendant has breached the Policy and Class Policies in the following respects:

    a. By using unauthorized and undisclosed factors to compute the Applied Monthly Rates under the Policy, and similar Mortality-Based Rates under the Class Policies, Defendant impermissibly increased Applied Monthly Rates for the Policies and similar rates for the Class Policies;

    b. By inflating Applied Monthly Rates under the Policy, and similar Mortality-Based Rates under the Class Policies, with maintenance, administrative, and other expense factors that are not disclosed as being used to determine those rates, Defendant impermissibly deducted maintenance, administrative, and other expenses from the Account Values of Plaintiff and the Class in amounts in excess of the fixed and maximum amounts expressly authorized by the Policy and Class Policies; and,

    c. Although Defendant's future mortality expectations have generally improved, Defendant has, on information and belief, failed to lower its Applied Monthly Rates for Plaintiff's Policy or similar Mortality-Based Rates under the Class Policies, as required by the policy language.

74. Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and Class Policies and requests the Court to declare the aforementioned conduct of Defendant as unlawful and in material breach of the Policy and Class Policies so that future controversies may be avoided.

75. Pursuant to a declaration of the parties' respective rights and duties under the Policy and Class Policies, Plaintiff further seeks an injunction temporarily, preliminarily, and permanently enjoining Defendant (i) from continuing to engage in conduct in breach of the Policy and Class Policies, and from continuing to collect unlawfully inflated charges in violation of the Policy and Class Policies, and (ii) ordering Defendant to comply with the terms of its Policies and the Class Policies in regards to its assessment of charges against Account Values – including, requiring Defendant to appropriately decrease Applied Monthly Rates and Mortality-Based Rates to reflect its current expectations of future mortality experience.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

1. That the Court enter an order certifying this case as a class action under California Code of Civil Procedure § 382, and appointing Plaintiff and her counsel to represent the class (All Causes of Action);

2. For compensatory damages in an amount to be proven at trial (as to the First, Second, and Third Causes of Action);

3. For a declaration of the parties' respective rights and duties under the Policy and Class Policies, and that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy and Class Policies (as to the Fourth Cause of Action);

4. For temporary, preliminary, and permanent injunctive relief enjoining Defendant from continuing to engage in conduct in breach of the Policy and Class Policies, and from continuing to collect unlawfully inflated charges in violation of the Policy and Class Policies (as to the Fourth Case of Action);

5. For temporary, preliminary, and permanent injunctive relief ordering Defendant to comply with the terms of its Policies and the Class Policies in regards to its assessment of charges against Account Values – including, requiring Defendant to

CLASS ACTION COMPLAINT

appropriately decrease Applied Monthly Rates and Mortality-Based Rates to reflect its current expectations of future mortality experience (as to the Fourth Cause of Action);

6. For reasonable attorneys' fees as permitted by law;

7. For pre-judgment and post-judgment interest at the maximum rate permitted by law;

8. For Plaintiff's costs incurred; and

9. For such other and further relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this action be tried to a jury on all Causes of Action so triable.

Dated: April 29, 2016

GIRARD GIBBS LLP

By: _____

Daniel C. Girard (SBN 114826)
dcg@girardgibbs.com
Scott M. Grzenczyk (SBN 279309)
smg@girardgibbs.com
601 California Street, 14th Floor
San Francisco, California 94108
Tel:    415-981-4800
Fax:   415-981-4846

Patrick J. Stueve *(pro hac vice forthcoming)*
stueve@stuevesiegel.com
Norman E. Siegel *(pro hac vice forthcoming)*
siegel@stuevesiegel.com
Bradley T. Wilders *(pro hac vice forthcoming)*
wilders@stuevesiegel.com
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: 816-714-7100
Fax: 816-714-7101

John J. Schirger *(pro hac vice forthcoming)*
jschirger@millerschirger.com
Matthew W. Lytle *(pro hac vice forthcoming)*

mlytle@millerschirger.com
Joseph M. Feierabend *(pro hac vice forthcoming)*
jfeierabend@millerschirger.com
MILLER SCHIRGER, LLC
4520 Main Street, Suite 1570
Kansas City, Missouri 64111
Tel: 816-561-6500
Fax: 816-561-6501

*Attorneys For Plaintiff*

CLASS ACTION COMPLAINT

# EXHIBIT A

*John Hancock*  Variable Life Insurance Company    John Hancock Place
                                                    Boston, Massachusetts 02117

INSURED **BARBARA LARSON**                SUM INSURED  **$50,000**
                                          AT ISSUE

POLICY NUMBER **FV 3369489**              DATE OF ISSUE   **MAY 9, 2000**

DEATH BENEFIT **OPTION 3: LEVEL DEATH BENEFIT WITH GREATER FUNDING**

PLAN    SCHEDULED PREMIUM VARIABLE WHOLE LIFE

## INDIVIDUAL VARIABLE LIFE INSURANCE

The John Hancock Variable Life Insurance Company agrees, subject to the conditions and provisions of this policy, to pay the Death Benefit to the Beneficiary upon the death of the Insured if such death occurs while the policy is in full force, and to provide the other benefits, rights, and privileges of the policy. The Death Benefit (see Section 4) will be payable, subject to the "Deferral of Determinations and Payments" provision, on receipt at the Home Office of the Company of due proof of the Insured's death.

**The Death Benefit of this policy will increase or decrease based on the experience of the Separate Accounts.**

The policy, which includes any Riders which are a part of the policy on delivery, is issued in consideration of the application and the payment of the Minimum Initial Premium.

The Policy Specifications on pages 3 and the conditions and provisions on this and the following pages are part of the policy.

Signed for the Company at Boston, Massachusetts.

President                                 Secretary

Variable Whole Life policy                DUPLICATE
Scheduled Premiums payable for life       SEE ENDORSEMENT
Premium may increase at age 70
Provision for optional additional premiums
Death Benefit payable at death of Insured
Not eligible for dividends
Schedules of benefits and premiums, and the premium class, are shown on page 3

**To the extent any benefit, payment or value under this policy (including the Account Value) is based on the investment experience of a Separate Account, such benefit, payment or value may increase or decrease in accordance with the investment experience of the Separate Account and is not guaranteed as to fixed dollar amount. However, this policy provides a Guaranteed Death Benefit equal to the Sum Insured if the policy is not in default under Section 7 and there is no indebtedness.**

**Right to Cancel – The Owner may surrender this policy by delivering or mailing it to the Company at Boston, Massachusetts (or to the agent or agency office through which it was delivered) within 45 days after the date of Part A of the application, or within 10 days after receipt by the Owner of the policy, or within 10 days after mailing by the Company of the Notice of Withdrawal Right, whichever is latest. Immediately on such delivery or mailing, the policy shall be deemed void from the beginning. Any premium paid on it will be refunded.**

94–85                                                          F0194

## Policy Provisions

Section

1. Policy Specifications
2. Table Of Rates
3. Definitions
4. Death Benefit
5. Payments
6. Cumulative Premium Balance and Required Premium Target
7. Grace Period
8. Account Value
9. Excess Value
10. Recalculation of Base Policy Premium
11. Loans
12. Automatic Payment of Premiums
13. Surrenders and Withdrawals
14. Nonforfeiture Provisions
15. Separate Account and Fixed Account
16. Allocation of Subaccounts
17. Investment Policy Change
18. Annual Report To Owner
19. Reinstatement
20. Owner, contingent Owner, Beneficiary
21. Interest on Proceeds
22. Exchange of Policy During First 24 Months
23. Deferral of Determination and Payments
24. Claims of Creditors
25. Assignments
26. Incontestability
27. Misstatement of Age or Sex
28. Suicide
29. The Contract
30. Settlement Provisions

## Alphabetical Guide

Section

8. Account Value
16. Allocation To Subaccounts
18. Annual Report To Owner
25. Assignment
12. Automatic Payment of Premiums
14. Basis of Computation
20. Beneficiary
24. Claim of Creditors
20. Contingent Owner
29. Contract
6. Cumulative Premium Balance
4. Death Benefit
23. Deferral of Determination of Payments
3. Definitions
9. Excess Value
22. Exchange of Policy During First 24 Months
14. Fixed Extended Term Insurance
14. Fixed Paid-Up Insurance
7. Grace Period
26. Incontestability
21. Interest on Proceeds
17. Investment Policy Change
11. Loans
27. Misstatement of Age or Sex
14. Nonforfeiture Provisions
20. Owner
30. Optional Methods of Settlement
5. Payments
1. Policy Specifications
10. Recalculation of Base Policy Premium
19. Reinstatement
6. Required Premium Target
15. Separate Account and Fixed Account
30. Settlement Provisions
16. Subaccount Transfer Provision
28. Suicide
13. Surrenders
2. Table of Rates
16. Variable Account Transfer Provision
14. Variable Paid-Up Insurance
13. Withdrawals

Insured  **BARBARA LARSON**

Plan    Flex V – Scheduled Premium
        Variable Whole Life

Issue Age [1] **46**

Policy Number  **FV 3369489**

Policy Class **STANDARD**
             **NON SMOKER**

Date of Issue [1] **MAY 9, 2000**

Sum Insured at Issue:  **$50,000**

Death Benefit: Option 3– Level Death Benefit with Greater Funding

**The Owner and the Beneficiary are as designated in the Application, subject to Section 20.**

|  | ANNUAL PREMIUMS<br>AMOUNT |
| --- | --- |
| Base Policy Premium (Payable to age ) [2] 70 | $580.00 |
| Riders[3]<br> Disability Waiver of Premium | $32.65 |
| Required Premium (First Year) | $612.65 |
| Planned Premium | $612.72 |



*160000 03..69489 099 040*

[1] For any riders elected, the Date of Issue and the Issue Age of each rider is the Date of Issue and the Issue Age of the policy unless otherwise specified.

[2] The maximum base premium payable for life after recalculation under Section 10 depends upon the age at which the recalculation is made. This premium is derived by multiplying the rate shown on page 4 for the recalculation age by the Basic Death Benefit then in effect.

[3] For Description of Rider Benefits, see page 3C of this policy.

F0394

A. Current Policy Charges [1]

### Current Deductions from Premium Payments

| | |
|---|---|
| State Premium Tax Charge | 2.35% of Premium |
| Federal DAC Tax Charge | 1.25% of Premium |
| Premium Charge [2] | 5.0%  of Required Premium |

### Current Deductions from Account Value

| | |
|---|---|
| Issue Charge | $20.00 Per Month for first 12 Months only |
| Maintenance Charge | $6.00 Per Month |
| Guaranteed Death Benefit Charge | $0.50  Per Month |

### Current Deferred Sales Charge [3]

| During Policy Years | Percent of Cumulative Base Policy Premiums Paid |
|---|---|
| 1– 6 | 15.00% |
| 7 | 12.86% |
| 8 | 10.00% |
| 9 | 7.78% |
| 10 | 6.00% |
| 11 | 4.55% |
| 12 | 2.92% |
| 13 | 1.54% |
| 14 and after | 0.00% |

### Current Administrative Surrender Charge [3]

| During Policy Years | Current Charge |
|---|---|
| 1–4 | $5.00 per $1,000 |
| 5 and after | $0 |

[1] We reserve the right to change the amount or percentage of any of these charges, but no charge will exceed the amount or percentage shown in the Table of Maximum Policy deductions on page 3B.

[2] The Premium Charge currently applies only in the first ten years. We reserve the right to apply this charge in any year after the first 10 years.

[3] This charge is imposed only upon surrender of the policy.

**B. Maximum Policy Charges**

### Maximum Deductions from Premium Payments

| | |
|---|---|
| State Premium Tax Charge | 2.35% of Premium |
| Federal DAC Tax Charge | 1.25% of Premium |
| Premium Charge | 5.0% of Required Premium |

### Maximum Deductions from Account Value

| | |
|---|---|
| Issue Charge | $20.00 Per Month for first 12 Months only |
| Maintenance Charge | $8.00 Per Month |
| Guaranteed Death Benefit Charge | $1.50 Per Month |

### Maximum Deferred Sales Charge

| During Policy Years | Percent of Cumulative Base Policy Premiums Paid |
|---|---|
| 1– 6 | 15.00% |
| 7 | 12.86% |
| 8 | 10.00% |
| 9 | 7.78% |
| 10 | 6.00% |
| 11 | 4.55% |
| 12 | 2.92% |
| 13 | 1.54% |
| 14 and after | 0.00% |

### Maximum Administrative Surrender Charge

| During Policy Years | Maximum Charge |
|---|---|
| 1–6 | $5.00 per $1,000 |
| 7–8 | $4.00 per $1,000 |
| 9 | $3.00 per $1,000 |
| 10 and after | $0.00 |



*160000 0336949 099 041*

F03B94

Insured  BARBARA  LARSON

Plan    Flex V – Scheduled Premium
        Variable Whole Life

Policy Number   FV 3369489

Date of Issue of Rider  May 09, 2000

### RIDER INFORMATION

| TYPE | DESCRIPTION | AMOUNT |
|---|---|---|
| Disability Benefit | Premiums are paid in event of Insured's Total Disability<br>This Benefit is in a Standard Premium Class | |

**A. Rate Table**

| Age[1] | Maximum Monthly rates per $1000 of amount at Risk[2] | Corridor Factor | Death Benefit Factor | Maximum Annual Premium Per $1000 of Sum Insured at Recalculation |
|---|---|---|---|---|
| 46 | 0.2660 | 2.09 | 3.3518 | 19.22 |
| 47 | 0.2850 | 2.03 | 3.2467 | 20.06 |
| 48 | 0.3050 | 1.97 | 3.1453 | 20.94 |
| 49 | 0.3260 | 1.91 | 3.0476 | 21.87 |
| 50 | 0.3500 | 1.85 | 2.9534 | 22.86 |
| 51 | 0.3760 | 1.78 | 2.8626 | 23.91 |
| 52 | 0.4050 | 1.71 | 2.7752 | 25.03 |
| 53 | 0.4390 | 1.64 | 2.6911 | 26.21 |
| 54 | 0.4750 | 1.57 | 2.6102 | 27.46 |
| 55 | 0.5120 | 1.50 | 2.5323 | 28.79 |
| 56 | 0.5510 | 1.46 | 2.4574 | 30.21 |
| 57 | 0.5890 | 1.42 | 2.3852 | 31.72 |
| 58 | 0.6260 | 1.38 | 2.3155 | 33.34 |
| 59 | 0.6660 | 1.34 | 2.2480 | 35.08 |
| 60 | 0.7120 | 1.30 | 2.1826 | 36.95 |
| 61 | 0.7670 | 1.28 | 2.1194 | 38.98 |
| 62 | 0.8350 | 1.26 | 2.0584 | 41.16 |
| 63 | 0.9220 | 1.24 | 1.9998 | 43.52 |
| 64 | 1.0250 | 1.22 | 1.9437 | 46.05 |
| 65 | 1.1360 | 1.20 | 1.8901 | 48.77 |
| 66 | 1.2560 | 1.19 | 1.8390 | 51.69 |
| 67 | 1.3780 | 1.18 | 1.7901 | 54.84 |
| 68 | 1.5010 | 1.17 | 1.7432 | 58.25 |
| 69 | 1.6320 | 1.16 | 1.6981 | 61.97 |
| 70 | 1.7840 | 1.15 | 1.6546 | 66.06 |
| 71 | 1.9660 | 1.13 | 1.6127 | |
| 72 | 2.1920 | 1.11 | 1.5725 | |
| 73 | 2.4680 | 1.09 | 1.5342 | |
| 74 | 2.7940 | 1.07 | 1.4980 | |
| 75 | 3.1650 | 1.05 | 1.4638 | |
| 76 | 3.5730 | 1.05 | 1.4316 | |
| 77 | 4.0130 | 1.05 | 1.4014 | |
| 78 | 4.4870 | 1.05 | 1.3729 | |
| 79 | 5.0060 | 1.05 | 1.3460 | |
| 80 | 5.5960 | 1.05 | 1.3204 | |
| 81 | 6.2750 | 1.05 | 1.2963 | |
| 82 | 7.0680 | 1.05 | 1.2735 | |
| 83 | 7.9880 | 1.05 | 1.2522 | |
| 84 | 9.0200 | 1.05 | 1.2324 | |
| 85 | 10.1640 | 1.05 | 1.2141 | |
| 86 | 11.4040 | 1.05 | 1.1971 | |
| 87 | 12.7500 | 1.05 | 1.1814 | |
| 88 | 14.1910 | 1.05 | 1.1668 | |
| 89 | 15.7550 | 1.05 | 1.1530 | |
| 90 | 17.4460 | 1.05 | 1.1399 | |
| 91 | 19.3050 | 1.04 | 1.1273 | |
| 92 | 21.3970 | 1.03 | 1.1149 | |
| 93 | 23.8400 | 1.02 | 1.1025 | |
| 94 | 26.9260 | 1.01 | 1.0897 | |
| 95 | 31.3100 | 1.00 | 1.0764 | |

[1] On a Policy anniversary "age" means the age of the Insured at his or her birthday nearest that date. That "age" will apply until the next anniversary.

[2] Maximum Monthly Rates are based on the 1980 Commissioners Standard Ordinary Smoker and Nonsmoker Mortality Tables.

*160000 0389489 099 042*

F0494



**A. Rate Table (continued)**

| Age[1] | Maximum Monthly rates per $1000 of amount at Risk[2] | Corridor Factor | Death Benefit Factor | Maximum Annual Premium Per $1000 of Sum Insured at Recalculation |
|---|---|---|---|---|
| 96 | 38.5050 | 1.00 | 1.0624 | |
| 97 | 52.2760 | 1.00 | 1.0480 | |
| 98 | 85.0540 | 1.00 | 1.0335 | |
| 99 | 165.3400 | 1.00 | 1.0198 | |

[1] On a Policy anniversary "age" means the age of the Insured at his or her birthday nearest that date. That "age" will apply until the next anniversary.

[2] Maximum Monthly Rates are based on the 1980 Commissioners Standard Ordinary Smoker and Nonsmoker Mortality Tables.

**"Age"** means on any given date, the age of the person in question at his or her birthday nearest that date.

**"Annual Processing Date"** means every 12th Processing Date starting with the Processing Date next after the Date of Issue.

**"Fixed Account"** means an account established by us which accumulates at rates which we will determine and declare from time to time, but which will not be less than 4%. The assets of a Fixed Account are invested in a segment of our General Account.

**"Fund"** means a series type mutual fund registered under the Investment Company Act of 1940 as an open-end diversified management investment company.

**"In full force"** means that the policy has not lapsed in accordance with Section 7.

**"Indebtedness"** means the unpaid balance of a policy loan plus accrued interest.

**"Minimum Initial Premium"** means all or the appropriate portion of the Required Premium as shown on page 3 in accordance with the premium billing interval selected in the application.

**"Modal Processing Date"** means the first Processing Date of each premium billing interval.

**"Payment"** means, unless otherwise stated, payment at our Home Office in Boston, Massachusetts.

**"Policy Year"** means (a) or (b) below whichever is applicable:

    (a) The first Policy Year is the period beginning on the Date of Issue and ending on the Valuation Date immediately preceding the first Annual Processing Date;

    (b) Each subsequent Policy Year is the period beginning on an Annual Processing Date and ending on the Valuation Date immediately preceding the next Annual Processing Date.

**"Portfolio"** means each division of a Fund which has a specific investment objective.

**"Processing Date"** means the first day of a policy month which immediately follows a Valuation Date. The Date of Issue is not a Processing Date.

**"Separate Account",** unmodified, means a separate investment account, established by us pursuant to applicable law, in which you are eligible to invest under this policy.

**"Subaccount"** means a Variable Account or a Fixed Account

**"Valuation Date"** means any date on which we are open for business, on which the New York Stock Exchange is open for trading and on which the Fund values its shares.

**"Valuation Period"** means the period of time from the beginning of the day following a Valuation Date to the end of the next following Valuation Date.

**"Variable Account"** means each division of a Separate Account which has a specific investment objective. The assets of each Variable Account are invested solely in shares of the corresponding Portfolio of a Fund.

**"We", "us",** and **"our"** refer only to the John Hancock Variable Life Insurance Company.

**"Written Notice"** means, unless otherwise stated, a written notice filed at our Home Office in Boston, Massachussetts.

**"You"**and **"your"**refer only to the Owner of this policy.

F0594

The Death Benefit is payable when the Insured dies while the policy is in full force. This Death Benefit will equal the death benefit of the policy as shown below minus any indebtedness on the date of death. If the Insured dies during a grace period we will also deduct any unpaid portion of the Default Payment as defined in Section 7.

The death benefit of the policy depends on which of the following Options is selected at the time the policy is issued, subject to the limitation below:

**Option 1: Level Death Benefit:** The death benefit of the policy is the greater of: (i) the Guaranteed Death Benefit; and (ii) the Account Value on the date of death times the applicable Corridor Factor shown in Section 2.

**Option 2: Variable Death Benefit:** The death benefit of the policy is the greater of: (i) the Guaranteed Death Benefit plus the Excess Value on the date of death; and (ii) the Account Value on the date of death times the applicable Corridor Factor shown in Section 2.

**Option 3: Level Death Benefit with Greater Funding:** The death benefit of the policy is the greater of: (i) the Guaranteed Death Benefit; and (ii) the Account Value on the date of death times the applicable Death Benefit Factor shown in Section 2.

For Insureds age 19 and below at Date of Issue, only Death Benefit Option 3 is available.

You may change between death benefit option 1 and 2 after issue, subject to our administrative rules then in effect. However, you may not change to or from option 3.

The Guaranteed Death Benefit is equal to the Sum Insured then in effect. The Sum Insured at Issue is shown on page 3.

## 5. PAYMENTS

Payments under the policy shall be made only to us at our Home Office.

When we receive a payment, we first deduct any amount specified as payment of accrued interest on loans then due under Section 11 and any amount specified as loan repayment. The remainder will constitute Premium and will be added to the Cumulative Premium Balance. We then deduct the State Premium Tax Charge, the Federal DAC Tax Charge, and Premium Charge. The remainder will constitute Net Premium.

If coverage under the policy takes effect in accordance with the provisions of the application, the following will apply:

(a) All amounts received prior to the Date of Issue will be processed as if received on the day preceding the Date of Issue.

(b) If a payment equal to the Minimum Initial Premium is not received prior to the Date of Issue, a portion of each payment subsequently received will be processed as if received on the day preceding the Date of Issue. Each such portion will be equal to the (i) Minimum Initial Premium minus (ii) all payments previously received. The remainder, if any, of each such payment will be processed as of the date of receipt.

Except as provided above and in Section 7, all payments will be processed as of the date of receipt.

Subject to our maximum limits you may pay Premiums in excess of the Required Premium while the policy is in full force. During the first two years we may refuse any Premium in excess of the amount required to make the Cumulative Premium Balance equal to the Required Premium Target in effect on the next Annual Processing Date. Thereafter, we may refuse any Premium in excess of the amount required to make the Cumulative Premium Balance equal to the Required Premium Target in effect on the date of payment as determined in accordance with Section 6.

## 6. CUMULATIVE PREMIUM BALANCE AND REQUIRED PREMIUM TARGET

The Cumulative Premium Balance is the amount equal to the Premiums paid less amounts subtracted in accordance with Section 13.

The Annual Required Premium is determined on each Annual Processing Date for the policy year beginning on such Annual Processing Date. The Required Annual Premium will equal the Base Policy Premium in effect on the Annual Processing Date plus the Rider and Rating Premium then in effect. The Required Modal Premium on each Modal Processing Date will equal the Required Annual Premium divided by 12 multiplied by the number of months in the premium billing interval then in effect.

On each Annual Processing Date, we will determine the Required Premium Target. The Required Premium Target will be the sum of (a) and (b) where:

(a) is the Required Modal Premium then in effect; and

(b) is either (i) the Required Premium Target as of the last Modal Processing Date, or (ii) the Cumulative Premium Balance if the Base Policy Premium has been recalculated effective on such Modal Processing Date in accordance with Section 10.

On the first Modal Processing Date, the amount in (b)(i) above shall be equal to the Minimum Initial Premium.

If the policy would have been in default under Section 7 on the immediately preceding Modal Processing Date, but was deemed not to be in default because the policy passed the test in the second paragraph of said Section, and if the total Premium received since such last Modal Processing Date is less than the Default Payment as determined under said section, then the Required Premium Target for the current Modal Processing Date will be reduced by the unpaid amount of such Default Payment.

## 7. GRACE PERIOD

On each Modal Processing Date, we will compare the Cumulative Premium Balance at the end of the immediately preceding Valuation Date to the applicable Required Premium Target as defined in Section 6. Thereafter, on each Modal Processing Date we will compare the Cumulative Premium Balance at the end of the immediately Preceding Valuation Date to the Modal Required Premium Target. If, on any such Modal Processing Date, the Cumulative Premium Balance is less than the Required Premium Target, the policy will be deemed to be in default as of the Processing Date on which such determination is made. We will send a notice to your last known address specifying the minimum amount you must pay to cure the default (the "Default Payment"). The Default Payment will be equal to the difference between the Cumulative Premium Balance and the Required Premium Target.

On each Modal Processing Date, the policy will not be deemed to be in default if the Account Value at the end of the immediately preceding Valuation Date is greater than or equal to the Basic Account Value (see Section 9.). If the policy is deemed not to be in default by virtue of the test in this paragraph, the Required Premium Target on the Valuation Date immediately proceeding the next Processing Date will be reduced by the amount that would otherwise have been determined to be the Default Payment less any premiums paid since the date the policy would have been in default in accordance with the first paragraph of this Section.

Any amount in default may be paid within a grace period of 61 days after the date of default. We will send notice to your last known address at least 31 days before the end of the grace period specifying the minimum payment that you must make to continue the policy in force beyond the end of the grace period. When payment is received, any Section 9 charges which are past due and unpaid will be deducted from the Account Value.

Any payment in excess of the amount in default will be processed as of the date of receipt.

If a payment at least equal to the amount in default is not received by the end of the grace period, and the policy has not passed the test as described in the second paragraph of this Section, then the policy will lapse and will not be in full force. Upon lapse, the policy will be administered in accordance with Section 14. If the Insured dies during the grace period, we will deduct the Default Payment from the proceeds.

No Rider provisions will be in effect after the policy ceases to be in full force.

*160000 03-489489 099 044*



F0794

The Account Value as of the end of any Valuation Period is derived as follows:

(a) We will determine the value of the Subaccount as of the end of the Valuation Period in accordance with Section 15.

(b) We will then determine the share of this policy in each Subaccount and the total value of such shares.

(c) We will then add any amount of Loan Assets, as defined in Section 11.

(d) We will then add any Net Premium received during the Valuation Period to the value derived in (c) above.

## CHARGES

On the Date of Issue and on every Processing Date, we will deduct in order each of the charges (a) through (f) in order from the Account Value at the end of the last prior Valuation Period, where:

(a) is the Maintenance Charge;

(b) is the Guaranteed Death Benefit Charge, if applicable;

(c) is the sum of all charges for Riders which are part of the policy, if applicable;

(d) is the sum of all charges for ratings, if applicable;

(e) is the Issue Charge; and

(f) is the Insurance Charge.

If the Account Value less the sum of charges (a), (b), (c), (d) and (f) is less than the Issue Charge, the Issue Charge will not be deducted but will be deferred.

Any portion of the Guaranteed Death Benefit Charge allocated to the Fixed Account in accordance with Section 16 will be waived.

The Insurance Charge on the Date of Issue or on any Processing Date is an amount equal to the applicable Applied Monthly Rate multiplied by the Net Amount at Risk on such Date of Issue or the Processing Date. Each Insurance Charge is deducted in advance of the insurance coverage to which it applies.

The Net Amount at Risk is the amount determined by subtracting (a) from the greater of (b) or (c) where:

(a) is the Account Value at the end of the immediately preceding Valuation Period less all charges due on the Date of Issue or Processing Date;

(b) (i) is the Sum Insured divided by 1.0032737 for death benefit options 1 and 3; or
(ii) is the Sum Insured divided by 1.0032737 plus the Excess Value for death benefit option 2; and

(c) (i) is the amount defined in (a) multiplied by the applicable Corridor Factor as shown in Section 2 for death benefit options 1 and 2;

(ii) is the amount defined in (a) multiplied by the applicable Death Benefit Factor as shown in Section 2 for death benefit option 3.

The Applied Monthly Rates are the actual rates used to calculate Insurance Charges. We will determine the Applied Monthly Rates to be used for this policy. They will not exceed the Maximum Monthly Rates shown in the applicable Table of Rates in Section 2. The Applied Monthly Rates will be based on our expectations of future mortality experience. They will be reviewed at least once every 5 policy years. Any change in Applied Monthly Rates will be made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force for the same length of time.

8

A monthly reduction in the Insurance Charge, as described below, may be made beginning on the first Processing Date in the tenth Policy Year. It is our present intention to effect this reduction in the tenth Policy Year and each Policy Year thereafter, but this reduction is not guaranteed.

The amount of the reduction will depend upon the length of time the policy has been in force. Beginning on the first Processing Date in the tenth Policy Year, the monthly Insurance Charge will be reduced by an amount equal to a percentage of the Account Value on the Processing Date in question. For each Processing Date during the tenth Policy Year, such percentage would be that which would yield an annual effective rate of .20%. The annual effective rate for each subsequent Policy Year up to and including the thirtieth Policy Year will increase by .01 percent per year. For each Policy Year after the thirtieth Policy Year, the annual effective rate will be .40%.

## 9. EXCESS VALUE

We will calculate the Excess Value at the beginning of each Processing Date.

The Excess Value is equal to the amount, if any, by which the Account Value as of the end of the immediately preceding Valuation Date exceeds the Basic Account Value.

The Basic Account Value on any Valuation Date is equal to the sum of (a) and (b) where:

- (a) is the greater of (i) 110% of the indebtedness as of that date or (ii) the value, as determined by us, required to support the Guaranteed Death Benefit; and
- (b) is the Rider/Rating Premium determined as of the Annual Processing Date.

The Excess Value, if any, will then be divided into two components--the Premium Component and the Experience Component. The Premium Component will be equal to the lesser of (a) and (b) where:

- (a) is the Excess Value; and
- (b) is the amount, if any, by which the Cumulative Premium Balance exceeds the Required Premium Target at the end of the Valuation Period immediately preceding the Processing Date.

The Experience Component will be equal to the amount, if any, by which the Excess Value exceeds the Premium Component.

## 10. RECALCULATION OF BASE POLICY PREMIUM



Effective on the Annual Processing Date nearest the Insured's 70th birthday, or the tenth policy anniversary, whichever is later, the Base Policy Premium required to maintain the Guaranteed Death Benefit for life will be recalculated. However, you may request an earlier recalculation. Such earlier recalculation will be effective on the Annual Processing Date next following receipt at our Home Office of such request. The new Base Policy Premium will depend on the amount applied to the recalculation less any applicable Recalculation Guarantee Charge. The amount applied will depend on the Account Value on the Valuation Date immediately preceding the date of recalculation, and the Guaranteed Death Benefit and the age of the Insured on the date of recalculation.

The new Base Policy Premium may be less than, equal to, or greater than the original Base Policy Premium shown on page 3. However, the new Base Policy Premium will not be greater than the maximum premium at recalculation shown in Section 2 for the age of the Insured on the date of recalculation.

The Recalculation Guarantee Charge, if applicable, will be equal to the amount applied to the recalculation times one and one half percent. We reserve the right to increase such percentage, but not to more than three percent.

*160000 03369489 099 045*

9                                                                                      F0994

You may borrow from us on receipt at our Home Office of a completed form satisfactory to us assigning the policy as the only security for the loan.

Loans may be made after the first Policy Year if (i) a Loan Value is available and (ii) the policy is not in force on the Extended Term Insurance basis. Each loan must be for at least $300 except when used to pay premiums. We may defer loans as provided by the law or as provided in Section 23. We will not defer loans to pay premiums on our policies.

The Loan Value while the policy is in full force or for loans advanced under Section 12 will be an amount equal to (i) 75% during the second and third policy years and 90% thereafter of the Variable Account portion, if any, of the Account Values, plus (ii) 100% of the Fixed Account portion, if any, of the Account Value, less (iii) any surrender charge then in effect.

The Loan Value while the policy is in force as Fixed Paid-Up Insurance will be the cash value. The Loan Value while the policy is in force as Variable Paid-Up Insurance will be an amount equal to (i) 75% during the second and third policy years and 90% thereafter of the Variable Account portion, if any, of the Account Value plus (ii) 100% of the Fixed Account portion, if any, of the Account Value.

Values, except for Fixed Paid-Up Insurance, will be determined, subject to the "Deferral of Determinations and Payments" provision, at the end of the Valuation Period in which the date of receipt of the loan application at our Home Office occurs or, for loans advanced under the Automatic Payment of Premiums provision, at the end of the Valuation Period in which the last day of the grace period occurs. Values for Fixed Paid-Up Insurance will be determined as of the next policy anniversary date discounted for interest at the loan rate.

The amount of loan available will be the Loan Value less any existing indebtedness.

We will annually determine, in the month preceding the policy anniversary, the loan interest rate for this policy. Determination will be made in the calendar month preceding the policy anniversary. This rate will apply to all indebtedness outstanding during the Policy Year next following the date of determination. The rate we determine will not exceed the higher of: (a) the "Published Monthly Average" for the calendar month which is two months before the month in which the date of determination occurs; and (b) 5%.

The "Published Monthly Average" means Moody's Corporate Bond Yield Average – Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor thereto.

If the "Published Monthly Average" is no longer published, we reserve the right to select a substitute that we deem appropriate, subject to applicable law or regulation.

When a new rate is determined: (a) we may increase the previous rate if the increase would be at least 1/2%; and (b) we must reduce the previous rate if the decrease would be at least 1/2%.

We will: (a) notify you of the initial loan interest rate at the time a loan, other than a loan advance under the "Automatic Payment of Premiums" provision, is made; (b) notify you of the initial loan interest rate as soon as practical after a loan is advanced under the "Automatic Payment of Premiums" provision; and (c) notify you in advance of any increase in the loan interest rate if there is outstanding indebtedness on the policy.

A loan may be repaid in full or in part at any time before the Insured's death, and while the policy is in full force.

While the policy is in full force or in force as Variable Paid-Up Insurance, "excess indebtedness" is the amount by which indebtedness exceeds an amount equal to the Account Value less any Deferred Sales Charge then in effect, and less any Administrative Surrender Charge then in effect. While the policy is in force as Fixed Paid-Up Insurance, "excess indebtedness" is the amount by which indebtedness exceeds the net single premium for the Paid-Up Insurance determined in accordance with the "Basis of Computations" provision of Section 14. "Notice Date" is the date on which notice of excess indebtedness is mailed to you and any assignee of record with us at the address last known to us. When excess indebtedness occurs, the policy will terminate at the end of the Valuation Period in which the 31st day after the Notice Date occurs if such excess has not been repaid by that date.

When a loan is made, the amount of the loan will be transferred to Loan Assets. The amount transferred will be removed from the Subaccounts in proportion to your policy investment in each Subaccount on the date such loan is made. Upon loan repayment, the same proportionate amount of the entire loan as was borrowed from the Fixed Account will be repaid to the Fixed Account. The remainder of the loan repayment will be allocated to the appropriate Subaccounts as stipulated in the current Subaccount Investment Option.

Loan Assets are the total of all loans advanced plus interest credited on each loan amount from the date of the loan at a rate at least equal to (i) the policy loan interest rate less 1% for Policy Years 1–20 and (ii) the policy loan interest rate less .5% for all Policy Years.

## 12. AUTOMATIC PAYMENT OF PREMIUMS

An election may be made for Automatic Payment of Premiums either in the application or by written notice acknowledged by us while the policy is in full force. You may revoke the election at any time by written notice.

While this election is in effect, we will pay any amount in default under the Grace Period provision which is unpaid at the end of the grace period by a loan which we will automatically advance, if sufficient. The loan will be subject to the provisions of Section 11. We will furnish annually to the Owner a statement indicating the amount of indebtedness.

While this election is in effect, if the amount of loan available is less than the amount in default, the policy will lapse and will be administered in accordance with Section 14.

## 13. SURRENDERS AND WITHDRAWALS

We will determine and pay the Surrender Value of the policy if the Insured is then alive, subject to Section 23, and the policy will terminate, as of the end of the Valuation Period in which occurs our receipt at our Home Office of (i) written notice, and (ii) the surrendered policy.

While the policy is in full force, the Surrender Value will be an amount equal to the Account Value less: (i) any Deferred Sales Charge then in effect, (ii) any Administrative Surrender Charge then in effect, and (iii) any indebtedness.

While the policy is in force as Fixed Extended Term Insurance or Fixed Paid–Up Insurance, the Surrender Value will be an amount equal to the policy cash value determined in accordance with the "Basis of Computations" provision of Section 14 less any indebtedness. While the policy is in force as Variable Paid–Up Insurance, the Surrender Value will be an amount equal to the Account Value less any indebtedness. Upon surrender within 30 days after a policy anniversary, the policy cash value of Fixed Extended Term Insurance or Fixed Paid–Up Insurance will not be less than the policy cash value on that anniversary.

On or after the first policy anniversary you may request a withdrawal of part or all of the Excess Value in accordance with our rules then in effect. Each withdrawal must be at least \$1000. For each withdrawal we will make a charge to the Account Value of \$20. All amounts withdrawn from the Premium Component of Excess Value will be subtracted from the Cumulative Premium Balance.

## 14. NONFORFEITURE PROVISIONS

### FIXED EXTENDED TERM INSURANCE, FIXED PAID–UP INSURANCE OR VARIABLE PAID–UP INSURANCE

When the policy ceases to be in full force under Section 7, we will apply the Surrender Value to provide insurance as follows:

(1) If the policy is in a Preferred or Standard Premium Class as shown on page 3 and paragraphs (2) and (3) below do not apply, we will provide Fixed Extended Term Insurance for the period as provided in the "Basis of Computations" provision. The amount of Fixed Extended Term Insurance will be equal to (i) the Guaranteed Death Benefit as of the end of the Valuation Period in which the date of default under Section 7 occurs less (ii) any indebtedness.


*160000 03J69489 099 046*

11                                                                                                          F1194

(2) We will provide Fixed Paid-Up Insurance for the amount as provided in the "Basis of Computations" provision if any of the following apply:

    (a) You elect this option.

    (b) The policy is in a Special Premium Class as shown on page 3.

    (c) You have elected Variable Paid-Up Insurance but the amount of Variable Paid-Up Insurance is less than $5,000.

    (d) Fixed Extended Term Insurance would otherwise apply, but the amount of Fixed Paid-Up Insurance would equal or exceed the amount of Fixed Extended Term Insurance.

(3) We will provide Variable Paid-Up Insurance for the amount as provided in the "Basis of Computations" provision if the policy is not in a Special Premium Class, you elect this option, and the amount of Variable Paid-Up Insurance is at least $5,000. The Death Benefit while the policy is in force under this option is (a) minus (b) where:

    (a) is the Account Value on the date of death multiplied by the applicable Death Benefit Factor shown in Section 2, and

    (b) is any indebtedness as of the date of death.

You may elect Variable Paid-Up Insurance or Fixed Paid-Up Insurance in place of Fixed Extended Term Insurance by written notice received by us no later than the last day of the grace period and before the Insured's death.

On the Insured's death we will pay to the Beneficiary in place of all other benefits any amount of Extended Term, Fixed Paid-Up or Variable Paid-Up Insurance then in force.

No rider provisions will be in effect after the Policy ceases to be in full force.

## BASIS OF COMPUTATIONS

Minimum values, reserves and net single premiums referred to in the policy are computed on the basis of the Commissioners 1980 Standard Ordinary Mortality Tables, except those for the Fixed Extended Term Insurance which are computed on the basis of the Commissioners 1980 Extended Term Insurance Table. The computations are made using interest at the rate of 4% a year and using continuous functions.

The Account Value while the policy is in full force is computed as described in Section 8. The Account Value while the Policy is in force as Variable Paid-Up Insurance is computed as described in Section 8 except that there is no deduction for Charges (a) through (e). The Applied Rates used to determine the Insurance Charge may differ from those used when the Policy is in full force, but will not exceed the Maximum Monthly Rates shown in Section 2.

Any policy cash value while the policy is in force as Fixed Extended Term Insurance or Fixed Paid-Up Insurance is equal to the applicable net single premium.

A detailed statement of the method of computation of values has been filed with insurance supervisory officials of the jurisdiction in which this policy has been delivered or issued for delivery. The values are not less than minimum values under the law of that jurisdiction.

Any values, reserves and premiums applicable to any provision for an additional benefit shall be specified in the provision and have no effect in determining the values available under the provisions of this Section 14.

## 15. SEPARATE ACCOUNT AND FIXED ACCOUNT

We will allocate Net Premiums, other credits, and charges to the Variable Account and the Fixed Account in accordance with Section 16. We will allocate a proportional share of the investment results of the Variable Accounts to your policy. We will make (i) a Valuation Period Mortality and Expense Risk Charge at a rate equivalent to .60% per year of the Variable Account assets and (ii) a charge for any applicable income taxes.

The assets of the Variable Accounts will be invested in shares of corresponding Portfolios of a Fund. The Portfolios will be valued at the end of each Valuation Period at a fair value in accordance with applicable law. We will deduct liabilities attributable to a Variable Account when determining the value of a Variable Account. The Variable Accounts available on the Date of Issue of this policy are shown in the Prospectus for this policy, along with any investment management fees associated with the corresponding Portfolios.

The assets of the Separate Account are the property of the Company. They shall be available to cover liabilities of our general account only to the extent that the assets of the Separate Account exceed the liabilities of the Separate Account arising under the variable life insurance policies supported by the Separate Account.

12

We reserve the right to make certain changes if, in our judgement, they would best serve the interests of the owners of policies such as this or would be appropriate in carrying out the purposes of such policies. Any changes will be made only to the extent and in the manner permitted by applicable laws. Also, when required by law, we will obtain your approval of the changes and approval from any appropriate regulatory authority.

Examples of the changes we may make include the following:

(a) To operate a Separate Account in any form permitted under the Investment Company Act of 1940, or in any other form permitted by law.

(b) To take any action necessary to comply with or obtain and continue any exemptions from the Investment Company Act of 1940.

(c) To transfer any assets in a Variable Account to another Variable Account; or to add, combine or remove Subaccounts.

(d) To substitute, for the investment company stock held in any Portfolio, another class of stock of the investment company or the stock of another investment company or any other investment permitted by law.

(e) To make any other necessary technical changes in this policy in order to conform with any action this provision permits us to take.

If any of these changes results in a material change in the underlying investments of Variable Accounts to which the reserves for this policy are allocated, we will notify you of such change. You may then make a new election under the Subaccount Investment Option and the Variable Account Transfer Provision.

## 16. ALLOCATION TO SUBACCOUNTS

We will allocate Net Premiums and other credits among the Subaccounts in accordance with the Subaccount Investment Option, as chosen by you and shown in the application for this policy. You may elect to change the Subaccount Investment Rule at any time provided the policy is not in a grace period under Section 7. A change will be effective at the end of the Valuation Period in which we receive written notice satisfactory to us. We reserve the right to impose limits on the number and frequency of such changes. The minimum percentage that may be allocated to any Subaccount and the maximum number of Subaccounts in which assets may be held will be subject to our administrative rules in effect at the time of election. We will allocate any charges under Section 8 among the applicable Subaccounts in proportion to your policy investment in each Subaccount on the date of the charge.

### FIXED ACCOUNT TRANSFER PROVISION

You may elect by written notice satisfactory to us to transfer without charge part or all of the assets in a Fixed Account, in the manner described below. Such a transfer will be permitted only during the period beginning 60 days before each policy anniversary and ending 30 days after such anniversary, and only once during such period. If the written notice is received on or before the anniversary, the transfer will be effective at the end of the Valuation Period during which the anniversary falls. If the written notice is received after the anniversary, the transfer will be effective at the end of the Valuation Period in which we receive the written notice. The maximum transfer amount is the greater of (i) $500 or (ii) 20% of the value of the Fixed Account as of the effective date of the transfer. We may defer the transfer for up to 6 months after the date your election would have been effective.

### VARIABLE ACCOUNT TRANSFER PROVISION

You may elect to transfer assets held in the Variable Accounts without charge. A transfer will be effective at the end of the Valuation Period in which we receive written notice satisfactory to us.

## 17. INVESTMENT POLICY CHANGE

The investment policy of the Portfolios shall not be materially changed unless a statement of the change is filed with, and not disapproved by the Insurance Commissioner of Massachusetts. In the event of such a change in investment policy, and while this policy is in full force you may elect a transfer in accordance with Section 16 within 60 days after (i) the effective date of the material change or (ii) the receipt of a notice of the available options, whichever is later. No charge will be made for any such transfer (regardless of the number of transfers previously made), which will be effective as of the end of the Valuation Period in which we receive the notice. If required, any statement of material change filed with the Insurance Commissioner of Massachusetts will be filed with the insurance supervisory officials of the jurisdiction in which this policy is delivered or issued for delivery.

While the policy is in full force, we will furnish annually to you a statement which shows:

(a) The Death Benefit, Guaranteed Death Benefit, and Surrender Value as of the date of the report;

(b) Payments received and charges made since the last report;

(c) Withdrawals since the last report; and

(d) Loan information.

We will furnish other reports if required by law or regulation.

## 19. REINSTATEMENT

If the policy lapses under Section 7, it may be reinstated within 3 years after the beginning of the grace period unless the Surrender Value has been paid or otherwise exhausted, or the period of any Fixed Extended Term Insurance has expired.

The date of reinstatement is the date as of which all 4 requirements below have been satisfied:

(1) We have received written application for reinstatement.

(2) We have received evidence of insurability satisfactory to us.

(3) We have received payment of a Premium equal to the sum of (a) and (b), each accumulated at an effective annual rate of 6% to the date of reinstatement, where:

    (a) is the difference between the Required Premium Target and the Cumulative Premium Balance at the date of lapse, and

    (b) is all Required Annual Premiums for the period between the date of lapse and the date of reinstatement; and

(4) We have approved the application for reinstatement and verified receipt of items (2) and (3) above.

On the date of reinstatement (i) the death benefit of the policy will be the same as if no lapse had occurred and (ii) the policy will have indebtedness equal to any indebtedness at the end of the day immediately preceding the date of reinstatement.

The Account Value on the date of reinstatement will be the sum of (a) through (c) less (d) through (e) where:

(a) is the Surrender Value of the nonforfeiture option in effect on the date of reinstatement plus any indebtedness on the date of reinstatement;

(b) is the amount in (3) above;

(c) is the Deferred Sales Charge adjustment (as defined below);

(d) is the sum of the Premium Charge, the State Premium Tax Charge, and the Federal DAC Tax Charge as of the date of reinstatement;

(e) is the sum of all Maintenance Charges and charges for Riders and ratings, if any, that would have been deducted from the date of lapse to the date of reinstatement if the policy had not lapsed, with interest at an effective annual rate of 6% to the date of reinstatement.

The Deferred Sales Charge used in item (c) above is the smaller of:

(i) the Deferred Sales Charge applicable if the policy were surrendered immediately after reinstatement; and

(ii) is the Deferred Sales Charge made on the date of lapse.

## 20. OWNER, CONTINGENT OWNER, BENEFICIARY

The Owner, the Contingent Owner (if any) and the Beneficiary will be as shown in the application unless you change them or they are changed by the terms of this provision.

You shall have the sole and absolute power to exercise all rights and privileges without the consent of any other person unless you provide otherwise by written notice; but if a person other than the Insured applied for this policy and you have not reached full age, only the court-appointed guardian of your estate may exercise your rights.

If the Insured dies and has no surviving Beneficiary, you will be the Beneficiary, but if you were the Insured, your estate will be Beneficiary.

While the Insured is alive, you may change the Owner, Contingent Owner and Beneficiary by written notice. You may also revoke any change of Owner prior to its effective date by written notice. No change or revocation will take effect unless we acknowledge receipt of the notice. If such acknowledgment occurs, then (i) a change of Beneficiary will take effect on the date the notice is signed, and (ii) a change or a revocation of Owner will take effect as of the date specified in the notice, or if no such date is specified, on the date the notice is signed. A change or revocation will take effect whether or not you or the Insured is alive on the date we acknowledge receipt. A change or revocation will be subject to the rights of any assignee of record with us and subject to any payment made or other action taken by us before we acknowledge receipt.

## 21. INTEREST ON PROCEEDS

We will pay interest on proceeds paid in one sum in the event of the Insured's death from the date of death to the date of payment. The rate will be the same as declared for Option 1 in Section 30, Settlement Provisions.

## 22. EXCHANGE OF POLICY DURING FIRST 24 MONTHS

At any time you may elect to transfer all assets held in the Variable Accounts to the Fixed Account. No charge will be made for such transfer regardless of the number of transfers previously made.

## 23. DEFERRAL OF DETERMINATIONS AND PAYMENTS

During any period when the New York Stock Exchange is closed for trading (except for normal holiday closings) or when the Securities and Exchange Commission has determined that a state of emergency exists which may make payment impractical, or the Commission by order permits postponement for the protection of our policyholders, we reserve the right to do the following:

(1) To defer determination of the Account Value, and if such determination has been deferred, to defer:

   (a) determination of the values for a loan (except for Fixed Paid-Up Insurance) as of the end of the Valuation Period in which we receive the loan application at our Home Office, and payment of the loan; and

   (b) payment or application of any Death Benefit in excess of the Guaranteed Death Benefit.

(2) To defer determination and payment of any Variable Paid-Up Insurance amount.

(3) To defer determination, application, processing, or payment of a Surrender Value or any other policy transaction dependent upon Account Value, unless this policy is in force as Fixed Extended Term Insurance or Fixed Paid-Up Insurance.

A deferral, as described above, will be applicable only if any portion of the Account Value is invested in a Variable Account.

The payment of a Surrender Value if the policy is in force as Fixed Extended Term Insurance or Fixed Paid-Up Insurance and payment of a loan if the policy is in force as Fixed Paid-Up Insurance may be deferred for up to 6 months from the date of receipt of written notice and any required surrender of the policy. If we defer such payment for more than 29 days, we will pay interest on any Surrender Value payment at the rate of 3 1/2% per year for the period payment is deferred.

Except as provided in this provision we will make payment of the Death Benefit, any Surrender Value, any withdrawal, or any loan amount within 7 days of the date it becomes payable.

*160000 0336949 099 048*

## 24. CLAIMS OF CREDITORS

The proceeds and any income payments under the policy will be exempt from the claims of creditors to the extent permitted by law. These proceeds and payments may not be assigned or withdrawn before becoming payable without our agreement.

## 25. ASSIGNMENT

Your interest in this policy may be assigned without the consent of any revocable Beneficiary. Your interest, any interest of the Insured and of any revocable Beneficiary shall be subject to the terms of the assignment.

We will not be on notice of any assignment unless it is in writing, nor will we be on notice until a duplicate of the original assignment has been received at our Home Office. We assume no responsibility for the validity or sufficiency of any assignment.

## 26. INCONTESTABILITY

This policy, except any provision for a disability benefit, shall be incontestable after it has been in force during the lifetime of the Insured for 2 years from its Date of Issue, except for nonpayment of premium. However, if we require evidence of insurability with respect to any payment we are authorized to refuse under Section 5, any increase in the Death Benefit resulting from such payment shall be incontestable after such increase has been in force during the lifetime of the Insured for 2 years from the effective date of such increase.

## 27. MISSTATEMENT OF AGE OR SEX

If the age or the sex of the Insured has been misstated, we will adjust the Sum Insured and every other benefit to that which would have been purchased at the correct age or sex by the most recent Insurance Charge deducted under Section 8.

## 28. SUICIDE

If the Insured commits suicide, while sane or insane, within 2 years from the Date of Issue, the policy will terminate on the date of such suicide and we will pay (in place of all other benefits) an amount equal to the Premiums paid less the amount of any indebtedness on the date of death and less any withdrawals under Section 13. If the Insured commits suicide, while sane or insane, after 2 years from the Date of Issue and within 2 years from the effective date of any increase in the Death Benefit resulting from any payment of Premium we are authorized to refuse under Section 5, the benefits payable under the policy will not include the amount of such Death Benefit increase but will include the amount of such Premium.

## 29. THE CONTRACT

The written application for the policy is attached at issue. The entire contract between the applicant and us consists of the policy and such application. However, additional written applications for policy changes or acceptance of excess payments under Section 5 may be submitted to us after issue and such additional applications may become part of the policy. All statements made in any application shall, in the absence of fraud, be deemed representations and not warranties. We will use no statement made by or on behalf of the Insured to defend a claim under the policy unless it is in a written application.

Policy years, policy months, and policy anniversaries are measured from the Date of Issue.

Any reference in this policy to a date means a calender day ending at midnight local time at our Home Office.

An exchange of this policy for a new policy on a different plan may be made by agreement between you and us in accordance with our published rules then in effect.

We reserve the right to make any changes necessary in order to keep this policy in compliance with any changes in federal or state tax laws. Other changes in this policy may be made by agreement between you and us. Only the President, Vice President, the Secretary, or an Assistant Secretary of the Company has authority to waive or agree to change in any respect any of the conditions or provisions of the policy, or to extend credit or to make an agreement for us.

### OPTIONAL METHODS OF SETTLEMENT

In place of a single payment, an amount of $1,000 or more payable under the policy as a benefit or as the Surrender Value, if any, may be left with us, under the terms of a supplementary agreement. The agreement will be issued when the proceeds are applied through the election of any one of the options below or any additional options we, in our sole discretion, may make available after issue. We shall at least annually declare the rate of interest or amount of payment for each option. Such declaration shall be effective until the date specified in the next declaration.

Option 1 – Interest Income at the declared rate but not less than 3.5% a year on proceeds held on deposit. The proceeds may be paid or withdrawn in whole or in part at any time as elected.

Option 2A – Income of a Specified Amount, with payments each year of at least 1/12th of the proceeds, until the proceeds plus interest is paid in full. We will credit interest on unpaid balances at the declared rate but not less than 3.5% a year.

Option 2B – Income for a Fixed Period, with each payment as declared but not less than that shown in the Table for Option 2B.

Option 3 – Life Income with Payments for a Guaranteed Period, with each payment as declared but not less than that shown in the Table for Option 3. If the Payee dies within the guaranteed period, we will pay the discounted value of the remaining guaranteed payments. In determining present value, we will use the same interest rate used to determine the payments for this option.

Option 4 – Life Income without Refund at the death of the Payee of any part of the proceeds applied. The amount of each payment shall be as declared but not less than that shown in the Table for Option 4.

Option 5 – Life Income with Cash Refund at the death of the Payee of the amount, if any, equal to the proceeds applied less the sum of all income payments made. The amount of each payment shall be as declared but not less than that shown in the Table for Option 5.

You may choose an option by sending written notice to us (a) while the Insured is alive; and (b) before the proceeds become payable. If you have made no effective choice, the Payee may make one by written notice within: (a) 6 months after the death of the Insured; or (b) 2 months after the date on which the proceeds, if any, are payable in any case except death.

No choice of an option may provide for income payment of less than $50.00. The first payment will be payable as of the date the proceeds are applied, except that under Option 1 it will be payable at the end of the first payment interval.

The Payee under an option shall be the Insured, if living, and otherwise the Beneficiary.

No option may be choosen without our consent if the proceeds are payable (1) in any case, except death, before the policy has been in force on the same plan for at least 5 years; or (2) in any case to an executor, administrator, trustee, corporation, partnership, association or assignee.

The Payee may, by written notice, name and change a Contingent Payee to receive any final amount that would otherwise be payable to the Payee's estate.

F1794

## Table for Options 2B, 3, 4 and 5

(Monthly payments for each $1000 of proceeds applied)

| OPTION 2B Income for a Fixed Period | | Age of Payee on Birthday Nearest Date of First Payment | OPTION 3 Life Income with Guaranteed Period | | OPTION 4 Life Income without Refund | OPTION 5 Life Income with Cash Refund |
|---|---|---|---|---|---|---|
| Period of Years | Payment | | 10 Years | 20 Years | | |
| 1 | 84.46 | 40 | 3.53 | 3.50 | 3.54 | 3.46 |
| 2 | 42.86 | 41 | 3.57 | 3.54 | 3.58 | 3.50 |
| 3 | 28.99 | 42 | 3.62 | 3.58 | 3.63 | 3.54 |
| 4 | 22.06 | 43 | 3.66 | 3.62 | 3.68 | 3.58 |
| 5 | 17.91 | 44 | 3.77 | 3.66 | 3.73 | 3.62 |
| 6 | 15.14 | 45 | 3.76 | 3.71 | 3.78 | 3.66 |
| 7 | 13.16 | 46 | 3.82 | 3.75 | 3.83 | 3.71 |
| 8 | 11.68 | 47 | 3.87 | 3.80 | 3.89 | 3.75 |
| 9 | 10.53 | 48 | 3.93 | 3.85 | 3.95 | 3.80 |
| 10 | 9.61 | 49 | 3.99 | 3.90 | 4.02 | 3.85 |
| 11 | 8.86 | 50 | 4.05 | 3.95 | 4.08 | 3.91 |
| 12 | 8.24 | 51 | 4.12 | 4.01 | 4.15 | 3.96 |
| 13 | 7.71 | 52 | 4.19 | 4.06 | 4.22 | 4.02 |
| 14 | 7.26 | 53 | 4.26 | 4.12 | 4.30 | 4.08 |
| 15 | 6.87 | 54 | 4.34 | 4.18 | 4.38 | 4.15 |
| 16 | 6.53 | 55 | 4.42 | 4.24 | 4.47 | 4.21 |
| 17 | 6.23 | 56 | 4.50 | 4.31 | 4.56 | 4.28 |
| 18 | 5.96 | 57 | 4.59 | 4.37 | 4.66 | 4.36 |
| 19 | 5.73 | 58 | 4.69 | 4.44 | 4.76 | 4.44 |
| 20 | 5.51 | 59 | 4.79 | 4.50 | 4.87 | 4.52 |
| 21 | 5.32 | 60 | 4.89 | 4.57 | 4.99 | 4.60 |
| 22 | 5.15 | 61 | 5.00 | 4.64 | 5.11 | 4.69 |
| 23 | 4.99 | 62 | 5.12 | 4.71 | 5.25 | 4.78 |
| 24 | 4.84 | 63 | 5.24 | 4.77 | 5.39 | 4.88 |
| 25 | 4.71 | 64 | 5.37 | 4.84 | 5.54 | 4.99 |
| 26 | 4.59 | 65 | 5.50 | 4.91 | 5.70 | 5.09 |
| 27 | 4.47 | 66 | 5.64 | 4.97 | 5.87 | 5.21 |
| 28 | 4.37 | 67 | 5.79 | 5.03 | 6.06 | 5.33 |
| 29 | 4.27 | 68 | 5.94 | 5.09 | 6.26 | 5.46 |
| 30 | 4.18 | 69 | 6.10 | 5.14 | 6.47 | 5.59 |
| Annual, Semi-annual or quarterly payments under Option 2B are 11.839, 5.963 and 2.993 respectively times the monthly payments. | | 70 | 6.27 | 5.19 | 6.69 | 5.73 |
| | | 71 | 6.44 | 5.24 | 6.94 | 5.88 |
| | | 72 | 6.61 | 5.28 | 7.20 | 6.04 |
| | | 73 | 6.79 | 5.32 | 7.48 | 6.20 |
| | | 74 | 6.98 | 5.36 | 7.79 | 6.38 |
| | | 75 | 7.16 | 5.38 | 8.11 | 6.56 |
| | | 76 | 7.35 | 5.41 | 8.47 | 6.75 |
| | | 77 | 7.54 | 5.43 | 8.84 | 6.96 |
| | | 78 | 7.72 | 5.45 | 9.25 | 7.17 |
| | | 79 | 7.91 | 5.46 | 9.69 | 7.39 |
| | | 80 | 8.08 | 5.48 | 10.17 | 7.64 |
| | | 81 | 8.25 | 5.49 | 10.68 | 7.88 |
| | | 82 | 8.41 | 5.49 | 11.23 | 8.13 |
| | | 83 | 8.56 | 5.50 | 11.82 | 8.43 |
| | | 84 | 8.71 | 5.50 | 12.46 | 8.70 |
| | | 85 & over | 8.83 | 5.51 | 13.14 | 8.99 |

Options 3, 4 and 5 are available only at the ages as shown.

 VARIABLE LIFE INSURANCE COMPANY

## DISABILITY BENEFIT RIDER
### PAYMENT OF PREMIUMS IN EVENT OF INSURED'S TOTAL DISABILITY AS DEFINED AND LIMITED

We agree, subject to the terms and conditions of this Rider and the policy, to pay the Premiums required to keep the policy from being deemed to be in default in accordance with Section 7 of the policy on receipt at our Home Office of due proof of the Insured's total disability at the time proof is given and that the total disability:

(1) Began between the policy anniversaries nearest the Insured's 5th and 65th birthdays while the policy and this Rider were in full force; and

(2) Has been continuous for a least 6 months.

This Rider is made a part of the policy to which it is attached. If this Rider is issued subsequent to delivery of the policy, the consideration for issuance of the Rider is: (a) the application for this Rider, a copy of which is attached to and made a part of the policy; and (b) payment of any additional Premium we may require because of the issuance of this Rider. The date of issue of this Rider is as provided in Section 1 of the policy.

The payment of any Premium under this Rider will not reduce payments under the policy.

### TOTAL DISABILITY DEFINED

"Total disability" means such incapacity of the Insured as a result of bodily injury or disease that:

(a) **For the first 24 months:** he or she is able to perform none of the duties of his or her occupation or employment for pay or profit; and

(b) **After the first 24 months:** he or she is able to perform none of the duties of any occupation or employment for pay or profit for which he or she is reasonably fitted by education, training or experience.

We will deem as "total disability" the total and irrecoverable loss by the Insured of: (a) the sight of both eyes; or (b) the use of both hands or both feet or of one hand and one foot.

### BEGINNING OF PERIOD OF PAYMENT OF PREMIUMS AND AMOUNT OF PAYMENTS

Premiums will be paid for the period of continuous total disability which starts with the next policy month after the later of: (a) the date total disability began; or (b) the date 1 year before written notice of claim is received.

Any Premiums paid other than by us during the period for which Premiums are paid that were required to be paid to keep the policy from being deemed to be in default will be refunded. No adjustment will be made to the Account Value as a result of this refund. We may pay a refund due the Insured to a person who we judge to be responsible for the welfare of the Insured.

The first Premium payment under this Rider will include all amounts that would have been paid from the beginning of the period of payment of Premiums if written notice of disability had been received before the next Processing Date after disability began less any Premiums refunded. On each subsequent Processing Date until the end of the period of payment of Premiums, a premium will be paid in an amount of one twelfth of the Required Premium determined in accordance with Section 6 of the policy and any additional amount that is required on such Processing Date to keep the policy from being deemed to be in default.

During the period of payment of Premiums:

(1) The Basic Account Value component (a) (ii) is equal to the Guaranteed Death Benefit divided by the applicable Death Benefit Factor shown in Section 2; and

(2) Recalculation of Base Policy Premium will occur only on the Annual Processing Date nearest the Insured's 70th birthday, or 10 year after issue if later.

### END OF PERIOD OF PAYMENT OF PREMIUMS

The last date to which we will pay Premiums will be the earlier of the dates in (1) and in (2), if applicable:

(1) The earliest of the dates when: (i) the disability ends, and (ii) proof of continued total disability is not given when required, and (iii) the Insured fails to be examined when required.

(2) In the event the total disability starts on or after the policy anniversary nearest the Insured's 60th birthday, the day before the anniversary nearest his or her 65th birthday.

### EXCEPTIONS AND EXCLUSIONS

No Premiums will be paid:

(1) If the total disability begins within 2 years after the date of issue of this Rider and results from an injury sustained or a disease first manifested before such date of issue;

(2) If the total disability has ceased or the Insured has died prior to receipt of due proof of total disability;

(3) If the total disability results from: (a) willfully and intentionally self-inflicted injury; or (b) service in an armed force of an international body, or a country or group of countries at war whether declared or undeclared;

(4) If the due proof is not received before this Rider terminates. But failure to give due proof in the time required will not void or reduce a claim if: (a) it was not reasonably possible to give proof in the time required; and (b) due proof is given as soon as reasonably possible; and (c) due proof is given no later than 1 year after the date it is otherwise required, except in the absence of legal capacity;

(5) During any policy years for which the component of Required Premium Target described in Section 6 of the policy is zero.

### WRITTEN NOTICE OF CLAIM

Written notice of claim may be filed with us to determine the beginning of the period for which benefits are provided; but no benefit will start until we receive the required due proof.

In any case in which written notice is filed more than 1 year after the disability began, benefits will start as if notice had been filed within 1 year. But it must be shown that it was furnished as soon as was reasonably possible.

### PROOF OF CONTINUANCE OF TOTAL DISABILITY

We shall have the right to require proof of continued total disability at reasonable intervals after receipt of due proof. After the policy anniversary nearest the Insured's 65th birthday no proof will be required if the period of total disability began before and has been continuous since the policy anniversary nearest the Insured's 60th birthday.

As part of any proof, the Insured may be required to be examined by a medical examiner named by us at our expense.

### INCONTESTABILITY

This Rider shall be incontestable after it has been in force during the lifetime of the Insured and without the occurrence of the total disability of the Insured, for 2 years from its date of issue except for nonpayment of premium. The date of issue is shown on page 3 of the policy.

### DISCONTINUANCE ON REQUEST

This Rider may be discontinued as of any Processing Date on receipt of written notice and presentation of the policy for adjustment to us at our Home Office before the Processing Date and before the Insured's death.

**TERMINATION**

This Rider will terminate on the earliest of:

a.  The lapse, exchange or termination of the policy; or

b.  The payment or application of the Surrender Value; or

c.  The date this Rider is discontinued on request; or

d.  The Insured's death or the policy anniversary nearest the Insured's 65th birthday except for benefits for total disability which began before the policy anniversary nearest the Insured's 60th birthday.

**Signed for the Company at Boston, Massachusetts.**

Michele G. Van Leer

President

Peter Scavongelli

Secretary

 VARIABLE LIFE INSURANCE COMPANY

---

## ENDORSEMENT

Under the "Loans" provision, references to variable rate are deleted and substituted with the following:

The loan interest rate is a fixed rate. The effective annual rate of Loan Interest for years 1–20 is 5%. The effective annual rate of Loan Interest for years 21 and after is 4.5%. The Loan Interest will accrue daily and will be payable on each Annual Processing Date and on the date the loan is settled. Accrued interest will be added to the loan daily and will bear interest from that date at the same rate.

**Signed for the Company at Boston, Massachusetts.**

Peter J. Scavongelli
Secretary


*160000 0369489 099 052*


96FLRE

 FINANCIAL SERVICES

To cancel or surrender your life insurance policy you must provide written notice to us. The notice must contain at least all of the following:

1) An unequivocal request to cancel or surrender.
2) The policy number to be canceled or surrendered.
3) The insured's name on the policy to be canceled or surrendered.
4) The policyowner's signature and, if required by the policy or by a legally binding document of which we have actual notice, the signature of a collateral assignee, irrevocable beneficiary, or other person having an interest in the policy through the legally binding document.
5) Either the policy itself, or, in lieu of the policy, a statement that the policy itself has been lost or destroyed.



Communications about this policy may be sent to the Company at John Hancock Place, Boston, Massachusetts 02117. If you are not satisfied after contacting the Company, you may contact the California Department of Insurance Consumer Services Division, 300 South Spring Street, Los Angeles, California 90013, telephone number 1−800−233−9045.

Variable Whole Life policy
Scheduled Premiums payable for life
Provision for optional additional premiums
Death Benefit payable at death
Not eligible for dividends
Schedules of benefits and premiums, and the premium class, are shown on page 3

To the extent any benefit, payment or value under this policy (including the Account Value) is based on the investment experience of a Separate Account, such benefit, payment or value may increase or decrease in accordance with the investment experience of the Separate Account and is not guaranteed as to fixed dollar amount. However, this policy provides a Guaranteed Death Benefit equal to the Sum Insured if the policy is not in default under Section 7 and there is no indebtedness.

Right to Cancel − The Owner may surrender this policy by delivering or mailing it to the Company at Boston, Massachusetts (or to the agency office through which it was delivered) within 45 days after the date of Part A of the application, or within 10 days after receipt by the Owner of the policy, or within 10 days after mailing by the Company of the Notice of Withdrawal Right, whichever is latest. Immediately on such delivery or mailing, the policy shall be deemed void from the beginning. Any premium paid on it will be refunded.

*03369489 002*

# EXHIBIT B



Life Insurance Company (U.S.A.)
A Stock Company

LIFE INSURED **[John J. Doe]**

POLICY NUMBER [12 345 678]

PLAN NAME [Majestic Performance VUL]

**FLEXIBLE PREMIUM VARIABLE LIFE INSURANCE POLICY**
ADJUSTABLE DEATH BENEFIT
BENEFIT PAYABLE ON LIFE INSURED'S DEATH
FLEXIBLE PREMIUMS PAYABLE TO AGE 121 DURING THE LIFE INSURED'S LIFETIME
NON-PARTICIPATING (NOT ELIGIBLE FOR DIVIDENDS)

Subject to the conditions and provisions of this policy, if the Life Insured dies while the policy is in force, the John Hancock Life Insurance Company (U.S.A.) ("the Company") agrees to pay the Insurance Benefit to the beneficiary in a lump sum, and to provide the other benefits, rights, and privileges, if any, of the policy. The Insurance Benefit is described in Section 6. If the Company makes other plans of payment available other than a lump sum, then a Beneficiary may request written election of any such other plans in lieu of a lump sum.

**Your Net Premiums are added to your Policy Value. You may allocate them to one or more of the Investment Accounts and to the Fixed Account, subject to Section 17, and any other applicable provisions of the policy.**

**The portion of your Policy Value that is in an Investment Account will vary from day to day. The amount is not guaranteed; it may increase or decrease, depending on the investment experience of the underlying Subaccounts for the Investment Accounts that you have chosen.**

**The portion of your Policy Value that is in the Fixed Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than the Fixed Account Annual Rate shown in Section 1.**

**The amount of the Insurance Benefit, or the duration of the insurance coverage, or both, may be variable or fixed under specified conditions and may increase or decrease as described in Section 6.**

**READ YOUR POLICY CAREFULLY. It is a contract between you and us.**

**RIGHT TO RETURN POLICY. If for any reason you are not satisfied with your policy, you may return it for cancellation by delivering or mailing it to us or to the agent who sold it. If this policy does not replace another policy, you may return it within TEN days after receiving it, or if it replaces another policy, you may return it within TWENTY days after receiving it. We will refund in full the payment made. The policy will be void from the beginning.**

Signed for the Company by:

President

Secretary

**Policy Provisions**

**Section**

1. Policy Specifications
2. Table of Rates
3. Definitions
4. Qualification as Life Insurance
5. Total Face Amount
6. Insurance Benefit
7. Interest on Proceeds
8. Premiums
9. No-Lapse Guarantee
10. Grace Period
11. Policy Termination
12. Reinstatement
13. Coverage at and after Age 121
14. Policy Value
15. Loan Account, Fixed Account, Investment Accounts
16. Separate Account and Subaccounts
17. Allocations and Transfers
18. Loans
19. Surrenders and Withdrawals
20. Owner and Beneficiary
21. Assignment
22. Misstatements
23. Suicide
24. Incontestability
25. The Contract
26. Right to Postpone Payment of Benefits
27. Claims of Creditors
28. Reports to Owner
29. How Values are Computed

# 1. POLICY SPECIFICATIONS

| | | | |
|---|---|---|---|
| **Life Insured** | [JOHN DOE] | **Plan** | [Majestic Performance VUL] |
| **Age at Policy Date** | [35] | **Policy Number** | [12 345 678] |
| **[Sex]** | [MALE] | **Issue Date** | [January 1, 2006] |
| **Risk Classification** | [Standard] [Non Smoker] | **Policy Date** | [January 1, 2006] |
| **Additional Ratings** | [not applicable] | | |
| **Owner, Beneficiary** | As designated in the application or subsequently changed | | |
| **Death Benefit Option at Issue** | [Option 1] | | |
| **Life Insurance Qualification Test Elected** | [Guideline Premium Test] | | |

Base Face Amount at Issue $[500,000]

Supplemental Face Amount at Issue $[600,000]

Total Face Amount at Issue $[1,100,000]

**Governing Law** [Missouri]

### PREMIUMS AT ISSUE

| | |
|---|---|
| **Premium Mode** | [Annual] |
| **Planned Premium** | $ [7,400.00 per year] |
| **Minimum Initial Premium** | $ [ 227.50] |
| **No- Lapse Guarantee Premium** | $ [2,730.04 per year] |

**Notice:** This policy provides life insurance coverage for the lifetime of the Life Insured if sufficient premiums are paid. Premium payments in addition to the planned premium shown may need to be made to keep this policy and coverage in force. Keeping the policy and coverage in force will be affected by factors such as: changes in the current cost of insurance rates; the amount, timing and frequency of premium payments; the interest rate being credited to the Fixed Account; the investment experience of the Investment Accounts; changes to the death benefit option; changes in the Total Face Amount; loan activity; withdrawals; and deductions for any applicable Supplementary Benefit riders that are attached to, and made a part of, this policy. Also refer to the Grace Period and Policy Termination provisions in Sections 10 and 11.

MV0306A

## SCHEDULE OF SUPPLEMENTAL FACE AMOUNTS

| | |
|---|---|
| Supplemental Face Amount At Issue | $[  600,000] |
| Maximum Increasing Supplemental Face Amount | $[1,050,000] |
| Maximum Total Supplemental Face Amount | $[1,650,000] |

| Effective at Beginning of Policy Year | Supplemental Face Amount Increases | Total Supplemental Face Amount |
|---|---|---|
| 1 | $0 | $   600,000 |
| 2 | $  50,000 | $   650,000 |
| 3 | $  50,000 | $   700,000 |
| 4 | $  75,000 | $   775,000 |
| 5 | $  75,000 | $   850,000 |
| 6 | $100,000 | $   950,000 |
| 7 | $100,000 | $1,050,000 |
| 8 | $100,000 | $1,150,000 |
| 9 | $150,000 | $1,300,000 |
| 10 | $150,000 | $1,450,000 |
| 11 | $200,000 | $1,650,000 |
| 12 to 65 | $0 | $1,650,000 |

MV03106A

**<u>OTHER BENEFITS AND SPECIFICATIONS</u>**

[Not Applicable]

MV03206A

<u>**MAXIMUM EXPENSE CHARGES**</u>

**Deductions from Premium Payments**

**Premium Charge**     8% of each premium paid

**Monthly Deductions:** the following charges are deducted monthly from the Policy Value

**Administrative Charge**     $15.00

**Face Amount Charge**     $[0.0600] per $1000 of Base Face Amount for the first 4 Policy Years

**Cost of Insurance Charge**     Determined in accordance with Section 14.  Maximum monthly rates per $1,000 are shown in Section 2.

**Asset-Based Risk Charge**     Percentage of Investment Account assets deducted monthly as shown below:

| Policy Years | Percentage of Investment Account assets |
|---|---|
| 1 - 15 | 0.0625% |
| 16+ | 0.0200% |

**Other Charges**

**Surrender Charge**     Charge deducted from Policy Value equal to the percentage shown below multiplied by the lesser of either the sum of Premiums received during the first two Policy Years or the Target Premium shown under Table of Values of this Section 1.  See Sections 5 and 19 for details of when a Surrender Charge applies.

| Policy Year | Percentage* | Policy Year | Percentage* |
|---|---|---|---|
| 1 | [100.00]% | 7 | [90.00]% |
| 2 | [100.00]% | 8 | [70.00]% |
| 3 | [100.00]% | 9 | [50.00]% |
| 4 | [100.00]% | 10 | [30.00]% |
| 5 | [95.00]% | 11+ | [0.00]% |
| 6 | [95.00]% | | |

*Percentages shown are at the beginning of each Policy Year.  A proportionate grading percentage applies for other Policy Months.

**Supplementary Benefit Rider Charges**     Charges for applicable riders are shown under Supplementary Benefits of this Section 1.

**Withdrawal Fee**     $25.00 per withdrawal, or 2% of the withdrawal if less

## TABLE OF VALUES

**Refer to your policy provisions for details on the terms and values shown in this table.**

| | |
|---|---|
| Minimum Total Face Amount | $ 100,000 |
| Minimum Base Face Amount | $ 100,000 |
| Minimum Total Face Amount Decrease | $ 50,000 |

No-Lapse Guarantee Period
      Base Face Amount                              First [2] Policy Years from Policy Date
      Supplemental Face Amount (if elected)      First 2 Policy Years from Policy Date

| | |
|---|---|
| Allocation Date | [10TH day after the Issue Date] |
| Fixed Account Annual Rate | Not less than 3% |
| Loan Interest Credited Annual Rate | Not less than 3% |

Maximum Loan Interest Charged Annual Rate
      Policy Years 1-10                                   4.25%
      Policy Years 11+                                     3.25%

Maximum Loan Interest Credited Differential
      Policy Years 1-10                                   1.25%
      Policy Years 11+                                     .25%

| | |
|---|---|
| Minimum Loan Amount | $ 500 |
| Minimum Withdrawal Amount | $ 500 |
| Death Benefit Discount Factor | 1.0024663 |
| Maximum Transfer Fee (See Section 17 for Transfer Restrictions) | $25 |
| Fixed Account Maximum Transfer Percentage | 15% |
| Fixed Account Maximum Transfer Amount | $2,000 |
| Investment Account Maximum Transfer Amount | $ 1,000,000 |
| Target Premium | $ [3,920.00] |

## 2. TABLE OF RATES – Policy [12 345 678]

### A. RATE TABLE

| Age | Maximum Monthly Rates per $1,000 of Net Amount at Risk | Minimum Death Benefit Factors | Age | Maximum Monthly Rates per $1,000 of Net Amount at Risk | Minimum Death Benefit Factors |
|---|---|---|---|---|---|
| 35 | 0.0909 | 2.5000 | 79 | 5.2198 | 1.0500 |
| 36 | 0.0959 | 2.5000 | 80 | 5.8398 | 1.0500 |
| 37 | 0.1001 | 2.5000 | 81 | 6.5510 | 1.0500 |
| 38 | 0.1076 | 2.5000 | 82 | 7.2976 | 1.0500 |
| 39 | 0.1142 | 2.5000 | 83 | 8.1096 | 1.0500 |
| 40 | 0.1217 | 2.5000 | 84 | 9.0174 | 1.0500 |
| 41 | 0.1318 | 2.4300 | 85 | 10.0423 | 1.0500 |
| 42 | 0.1443 | 2.3600 | 86 | 11.1922 | 1.0500 |
| 43 | 0.1585 | 2.2900 | 87 | 12.4650 | 1.0500 |
| 44 | 0.1752 | 2.2200 | 88 | 13.8494 | 1.0500 |
| 45 | 0.1944 | 2.1500 | 89 | 15.3334 | 1.0500 |
| 46 | 0.2127 | 2.0900 | 90 | 16.9088 | 1.0500 |
| 47 | 0.2328 | 2.0300 | 91 | 18.4163 | 1.0400 |
| 48 | 0.2445 | 1.9700 | 92 | 20.0153 | 1.0300 |
| 49 | 0.2579 | 1.9100 | 93 | 21.7336 | 1.0200 |
| 50 | 0.2771 | 1.8500 | 94 | 23.5854 | 1.0100 |
| 51 | 0.2997 | 1.7800 | 95 | 25.5731 | 1.0000 |
| 52 | 0.3306 | 1.7100 | 96 | 27.4319 | 1.0000 |
| 53 | 0.3641 | 1.6400 | 97 | 29.4579 | 1.0000 |
| 54 | 0.4067 | 1.5700 | 98 | 31.6727 | 1.0000 |
| 55 | 0.4595 | 1.5000 | 99 | 34.0995 | 1.0000 |
| 56 | 0.5131 | 1.4600 | 100 | 36.7714 | 1.0000 |
| 57 | 0.5710 | 1.4200 | 101 | 38.9513 | 1.0000 |
| 58 | 0.6204 | 1.3800 | 102 | 41.3354 | 1.0000 |
| 59 | 0.6775 | 1.3400 | 103 | 43.9462 | 1.0000 |
| 60 | 0.7464 | 1.3000 | 104 | 46.8129 | 1.0000 |
| 61 | 0.8304 | 1.2800 | 105 | 49.9253 | 1.0000 |
| 62 | 0.9331 | 1.2600 | 106 | 53.3626 | 1.0000 |
| 63 | 1.0485 | 1.2400 | 107 | 57.1735 | 1.0000 |
| 64 | 1.1700 | 1.2200 | 108 | 61.4190 | 1.0000 |
| 65 | 1.2984 | 1.2000 | 109 | 66.1732 | 1.0000 |
| 66 | 1.4287 | 1.1900 | 110 | 71.5294 | 1.0000 |
| 67 | 1.5608 | 1.1800 | 111 | 77.6167 | 1.0000 |
| 68 | 1.7034 | 1.1700 | 112 | 83.3333 | 1.0000 |
| 69 | 1.8512 | 1.1600 | 113 | 83.3333 | 1.0000 |
| 70 | 2.0309 | 1.1500 | 114 | 83.3333 | 1.0000 |
| 71 | 2.2322 | 1.1300 | 115 | 83.3333 | 1.0000 |
| 72 | 2.4974 | 1.1100 | 116 | 83.3333 | 1.0000 |
| 73 | 2.7779 | 1.0900 | 117 | 83.3333 | 1.0000 |
| 74 | 3.0739 | 1.0700 | 118 | 83.3333 | 1.0000 |
| 75 | 3.3986 | 1.0500 | 119 | 83.3333 | 1.0000 |
| 76 | 3.7540 | 1.0500 | 120 | 83.3333 | 1.0000 |
| 77 | 4.1684 | 1.0500 | 121+ | 0 | 1.0000 |
| 78 | 4.6548 | 1.0500 | | | |

Maximum Monthly Rates are the same for the Base Face Amount and the Supplemental Face Amount and have been adjusted for any applicable Additional Ratings that are applied to the Cost of Insurance rates as shown in Section 1.

MV0406A

## 3. DEFINITIONS

The term **"Additional Rating"** is an increase in the Cost of Insurance that is applied when a Life Insured does not meet, at a minimum, our underwriting requirements for the standard Risk Classification.

The term **"Age"** means, on any policy anniversary, the age of the person in question at his or her birthday nearest that date.

The term **"Annual Processing Date"** means every 12th Processing Date starting with the Processing Date next after the Policy Date.

The term **"Business Day"** means any day that we are open for business and the New York Stock Exchange is open for trading. The net asset value of the underlying shares of a Subaccount will be determined at the end of each Business Day. We will deem each Business Day to end at the close of regularly scheduled trading of the New York Stock Exchange (currently 4:00 p.m. Eastern Time) on that day.

The term **"Cash Surrender Value"** equals the Policy Value less the Surrender Charge.

The term **"date"** means a calendar day ending at midnight local time at our Service Office.

The term **"Fixed Account"** is that part of the Policy Value which reflects the value you have in our general account.

The term **"Fund"** means each division, with a specific investment objective, of a Series Fund.

The term **"in force"** means that the policy has not terminated in accordance with Sections 9, 10, or 11, or surrendered in accordance with Section 19.

The term **"Investment Account"** means that part of the Policy Value which reflects the value you have in one of our Subaccounts.

The term **"Issue Date"** is the date shown in the Policy Specifications of this policy. Issue Date is also used to determine the Allocation Date shown in Section 1.

The term **"Loan Account"** is that part of the Policy Value which reflects amounts transferred from the Fixed Account or the Investment Accounts as collateral for a policy loan.

The term **"Minimum Initial Premium"** means the minimum premium needed to put the policy in force and is shown in Section 1.

The term **"Net Cash Surrender Value"** equals the Cash Surrender Value less the Policy Debt.

The term **"Net Premium"** is the gross premium paid less any Premium Charge. It is the amount of premium allocated to the Fixed Account and or to the Investment Accounts.

The term **"Planned Premium"** means the premium that is selected in the application for the policy, which is intended to be paid on a regular modal basis. It is shown in Section 1.

The term **"Policy Date"** is the date from which charges for the first Monthly Deductions are calculated. The Policy Date is shown in Section 1. Policy Years, Policy Months, and Policy Anniversaries are determined from the Policy Date.

The term **"Policy Debt"** as of any date equals (a) plus (b) plus (c), minus (d), where:

    (a)    is the total amount of loans borrowed as of such date;

    (b)    is the total amount of any unpaid loan interest charges borrowed against the policy on a Policy Anniversary;

    (c)    is any interest charges accrued from the last Policy Anniversary to the current date; and

    (d)    is the total amount of loan repayments as of such date.

The term **"Policy Value"** is the sum of the values in the Loan Account, the Investment Accounts, and the Fixed Account.

## 3. DEFINITIONS (continued)

The term **"Policy Year"** means (a) or (b) below, whichever is applicable.

(a)   The first Policy Year is the period beginning on the Policy Date and ending on the Business Day immediately preceding the first Annual Processing Date.

(b)   Each subsequent Policy Year is the period beginning on an Annual Processing Date and ending on the Business Day immediately preceding the next Annual Processing Date.

The term **"Processing Date"** means the first day of a Policy Month. A Policy Month shall begin on the day in each calendar month that corresponds to the day of the calendar month on which the Policy Date occurred. If the Policy Date is the 29th, 30th, or 31st day of a calendar month, then for any calendar month that has fewer days, the first day of the Policy Month will be the last day of such calendar month. The Policy Date is not a Processing Date.

The term **"Separate Account"** means Separate Account A of the John Hancock Life Insurance Company (U.S.A.).

The term **"Series Fund"** means a series type mutual fund registered under the Investment Company Act of 1940 as an open-end diversified management investment company.

The term **"Service Office"** is the office that we designate to service this policy as shown on the back cover of your policy.

The term **"Subaccount"** refers to one of the subaccounts of the Separate Account.

The term **"Surrender Charge Period"** is the period beginning on the Policy Date during which we will assess surrender charges. Surrender charges will apply during this period if you surrender the policy, request a decrease in the Base Face Amount, make a withdrawal that reduces the Base Face Amount, or if the policy terminates due to default. The Surrender Charge Period is shown in Section 1.

The terms **"we"**, **"us"**, and **"our"** refer only to the Company.

The term **"written request"** is your request to us which must be in a form satisfactory to us, signed and dated by you, and filed at our Service Office or, if permitted by our administrative practices, an electronic mail message ("e-mail") received by us at the internet address specified by us for receipt of such messages.

The terms **"you"** and **"your"** refer only to the Owner of this policy.

## 4. QUALIFICATION AS LIFE INSURANCE

It is the intent that this policy be considered as life insurance for federal income tax purposes, notwithstanding any other provisions of the policy to the contrary, in order to comply with Section 7702 of the Internal Revenue Code of 1986, or any other equivalent section of the Code. We reserve the right to make any reasonable adjustments to the terms or conditions of this policy if it becomes necessary to allow it to qualify as life insurance. This provision should not be construed to guarantee that this policy will receive tax treatment as life insurance or that the tax treatment of life insurance will never be changed by the future actions of any tax authority. In order for this policy to qualify as life insurance, one of the following tests will apply to the policy. The test you elected is shown in Section 1. Your election cannot be changed after issue.

**Guideline Premium Test**

Under this test, if at any time the premiums received under the policy exceed the amount allowable for such tax qualification, such excess amount shall be removed from the policy together with interest and/or investment experience thereon from the date of its payment, and any appropriate adjustment in the Death Benefit shall be made as of such date. This excess amount shall be refunded to you no later than 60 days after the end of the applicable Policy Year. If this excess amount is not refunded by then, the Total Face Amount under the policy shall be increased retroactively so that at no time is the Death Benefit ever less than the amount necessary to ensure or maintain such tax qualification. In no event, however, will we refuse to accept any premium necessary to prevent the policy from terminating but only if such premium payment would result in a zero Policy Value at the end of the Policy Year. In addition, the Minimum Death Benefit, as described in Section 6, must be maintained.

**Cash Value Accumulation Test**

Under this test, the Minimum Death Benefit, as described in Section 6, must be maintained. We reserve the right to modify the Minimum Death Benefit Factors shown in Section 2, retroactively if necessary, to ensure or maintain qualification of this policy as a life insurance contract for federal income tax purposes, notwithstanding any other provisions of this policy to the contrary.

**Effect on Life Insurance Qualification Tests**

A change in Death Benefit Option or Total Face Amount, or certain other policy changes, will often change the policy's limits under the life Insurance qualification test that you elected.

We reserve the right to refuse or limit any request for a change if the change would cause the policy to fail to qualify as life insurance for tax purposes.

## 5. TOTAL FACE AMOUNT

The Total Face Amount is made up of two components: (i) the Base Face Amount, and (ii) any Supplemental Face Amount. Minimum Base Face Amount and the minimum Total Face Amount limits are shown in Section 1. Scheduled increases in any Supplemental Face Amount are elected on the application and if approved, their amounts, when they are to become effective and the Maximum Increasing Supplemental Face Amount will be shown in Section 1. If you later request that an approved scheduled increase should not become effective or request a decrease in your Supplemental Face Amount coverage, we will abide by your request but we reserve the right to not put into effect all approved scheduled increases for subsequent policy years. After the first Policy Year, while the Life Insured is alive and the policy is in force, unscheduled changes to the Supplemental Face Amount may be requested in writing. We reserve the right to limit the number of such unscheduled changes to one per Policy Year. We also reserve the right to limit the maximum and minimum amounts of unscheduled changes. All requested changes will be subject to our approval. You may not increase your Base Face Amount of insurance under this policy except where such an increase may result from a change in Death Benefit Option from Option 2 to 1 as described in Section 6.

**Increase in Supplemental Face Amount**

As a condition of our approval of any unscheduled increase in Supplemental Face Amount, we may require evidence of insurability satisfactory to us. A minimum premium payment may also be required. When a requested change becomes effective, and if required by our then current rules, a change in future Planned Premiums will automatically be affected to comply with those rules. Any change will be effective on the next Annual Processing Date after our approval. If an increase in Supplemental Face Amount is elected and approved after the Policy Date, any remaining No Lapse Guarantee Period for the Base Face Amount will be reduced to zero.

**Reduction of Total Face Amount**

You may request a reduction in Total Face Amount while this policy is in force. The Minimum Total Face Amount Decrease is shown in Section 1. Any reduction in the Total Face Amount generally will be implemented by first reducing any Supplemental Face Amount, although we reserve the right to allow a reduction in Base Face Amount first. If there is a reduction in Base Face Amount, a charge may be deducted from the Policy Value. This charge will be equal to a proportionate part of the Surrender Charge that would have applied if the policy had been surrendered on the date the reduction in Base Face Amount takes effect. The proportion will be equal to the amount of the reduction in Base Face Amount divided by the amount of Base Face Amount in effect immediately before the reduction. This charge will also apply if a withdrawal, as described in Section 19, results in a reduction in Base Face Amount. Without our prior approval, the Base Face Amount cannot be reduced below the minimum as shown in Section 1. Any reduction in Supplemental Face Amount or Base Face Amount will be effective on the next Processing Date after our approval.

## 6. INSURANCE BENEFIT

If the Life Insured dies while the policy is in force, we will pay the Insurance Benefit upon receipt of due proof of death of the Life Insured, subject to any applicable provisions of the policy. If the Life Insured dies on or after the date we receive a request from you to surrender the policy, no Insurance Benefit will be paid. We will pay the amount payable under the Surrenders and Withdrawals provision instead.

**Insurance Benefit**

The Insurance Benefit payable is:

    (a)    the Death Benefit as described below; plus

    (b)    any amounts payable under any Supplementary Benefit riders as a result of the Life Insured's death that form part of the policy; less

    (c)    any outstanding Policy Debt at the date of death.

If the Life Insured dies during a grace period, the Policy Value used in the calculation of the Death Benefit will be the Policy Value as of the date of death of the Life Insured, and the Insurance Benefit will be reduced by any outstanding Monthly Deductions due.

**Death Benefit**

The Death Benefit will depend on whether Option 1 or Option 2 is in effect on the date of the Life Insured's death.

**Death Benefit Options**

Under Option 1, the Death Benefit is equal to the Total Face Amount at the date of death of the Life Insured. Under Option 2, the Death Benefit is equal to the Total Face Amount at the date of death of the Life Insured plus the Policy Value at the date of death of the Life Insured.

The Death Benefit after the Life Insured's Age 121 will be as described in Section 13.

If any withdrawals are made, the Death Benefit, whether Option 1 or Option 2 is in effect, will be less than it would have been if no withdrawals were made. Withdrawals reduce the Death Benefit by reducing:

    (a)    the Total Face Amount if Option 1 is in effect, as specified in Section 19; or

    (b)    the Policy Value if Option 2 is in effect.

**Change of Death Benefit Options**

You may request in writing to change your Death Benefit Option from Option 2 to Option 1 at any time after the first Policy Year, while the policy is in force. The change will be effective on the next Processing Date following the date we approve the request, and the Total Face Amount after the change will be equal to the Total Face Amount immediately before the change plus the Policy Value as of the effective date of the change.

**Minimum Death Benefit**

The sum of the Death Benefit as described above and the Benefit payable under any Supplementary Benefit riders will never be less than the Minimum Death Benefit. The Minimum Death Benefit is equal to the Policy Value on the date of death multiplied by the Minimum Death Benefit Factor for the Age of the Life Insured. The Minimum Death Benefit Factors are shown in Section 2. To the extent that the Net Amount at Risk associated with the Minimum Death Benefit that results from this calculation exceeds our guidelines and limitations that may be in effect, we reserve the right to:

    (a)    distribute to you a portion of the Policy Value such that the Net Amount at Risk associated with the resulting Minimum Death Benefit does not exceed our guidelines and limitations in effect; or

    (b)    if we should decide to accept the additional death benefit, require evidence of insurability satisfactory to us.

## 7. INTEREST ON PROCEEDS

We will pay the Insurance Benefit in one lump sum including interest as stipulated by the state. If the state does not specify the interest rate, we will use the rate for insurance benefits left on deposit with us.

## 8. PREMIUMS

The Minimum Initial Premium is shown in Section 1. No insurance will take effect under this policy until our underwriters approve issuance of this policy and the conditions specified in the application form have been satisfied, including receipt of at least the Minimum Initial Premium at our Service Office.

Subsequent premiums can be paid at any time at our Service Office, and in any amount subject to the limits described below. On request, we will give you a receipt signed by one of our officers.

If coverage under the policy takes effect in accordance with the provisions of the application, we will process any premium payment as of the end of the Business Day the payment is received at our Service Office, subject to the limitations of the life insurance qualification test elected by you and to our maximum limits then in effect, unless one of the following exceptions applies.

    (i)    We will process a payment received prior to the Policy Date as if received on the Policy Date.

    (ii)    We will process the portion of any premium payment for which we require evidence of the Life Insured's continued insurability on the first Business Day after we have received such evidence and found it satisfactory to us.

    (iii)    If our receipt of any premium payment (or portion thereof) would cause the policy not to qualify as a "life insurance contract" under the federal income tax laws, we will not process such payment or portion.  However, in the case of certain other tax situations, we will process the payment (or portion thereof) on the first Business Day after we have received satisfactory written instructions from you.

You may pay premiums until the Life Insured reaches Age 121, at which time Monthly Deductions cease and no further premiums may then be paid as described in Section 13.

Subject to our maximum limits then in effect, you may pay premiums in excess of the Planned Premium while the policy is in force.

If any premium payment would result in the Minimum Death Benefit exceeding the Total Face Amount, we reserve the right to either refund the premium or to require evidence of insurability satisfactory to us for any increase in the Minimum Death Benefit.

**Continuation of Insurance Upon Discontinuance of Premium Payments**
If you discontinue paying premiums, we will continue taking the Monthly Deductions from the Policy Value. Your insurance coverage will continue subject to the No-Lapse Guarantee, Grace Period, and Policy Termination provisions in Sections 9, 10 and 11.

## 9. NO-LAPSE GUARANTEE

Your policy includes a No-Lapse Guarantee.  The guarantee periods applicable to the Base Face Amount and to any Supplemental Face Amount are shown in the Table of Values in Section 1.  During your No-Lapse Guarantee Period, if the Net Cash Surrender Value falls to zero or below, your policy will not go into default provided it satisfies the cumulative premium test.

**Cumulative Premium Test**
The test will be performed on any Processing Date that your policy would otherwise be in default in the absence of the No-Lapse Guarantee.  Your policy will satisfy the test if the sum of the premiums received, less any Policy Debt, and less any withdrawals taken on or before the date of the test, is equal to or greater than the sum of the monthly No-Lapse Guarantee Premiums due from the Policy Date to the date of the test. The No-Lapse Guarantee Premium is shown as an annualized amount in the Table of Values in Section 1.

The No-Lapse Guarantee Premium may change if any of the following changes occur under your policy:

    (a)    you add, terminate or change a Supplementary Benefit rider;

    (b)    you change the Death Benefit Option under your policy;

    (c)    there is a change in the Base Face Amount or the Supplemental Face Amount; or

    (d)    there is a change in the Life Insured's Risk Classification or if applicable, Additional Rating.

We will inform you of any change to the No-Lapse Guarantee Premium resulting from any such change.  The revised No-Lapse Guarantee Premium will be effective from the date of the change.  For the purpose of performing the Cumulative Premium Test, we will use the No-Lapse Guarantee Premium in effect as of the Policy Date up to the date of the change, including any revised premium in effect as of the date of a prior change.

## 10. GRACE PERIOD

**Default**

Subject to the No-Lapse Guarantee feature of the policy, the policy and any Supplementary Benefit riders will go into default if, at the beginning of any Policy Month, the Net Cash Surrender Value is less than or equal to zero after we take the Monthly Deduction that is due for that month.

**Grace Period Duration**

We will allow 61 days from the date we will mail the notice that the policy is in default for you to pay the amount that is required to bring the policy out of default. We will send the notice to your last known address, specifying the amount you must pay to bring the policy out of default. If we have notice of a policy assignment on file at our Service Office, we will also mail a copy of the notice of the amount due to the assignee on record.

**Default Payment**

The amount required to bring the policy out of default, referred to as the Default Payment, is equal to (a) plus (b) plus (c) where:

    (a)    is the amount necessary to bring the Net Cash Surrender Value to zero if it is less than zero, at the date of default;

    (b)    is an amount equal to 3 times the Monthly Deduction due on the date of default;

    (c)    is the applicable Premium Charge.

When payment is received, any expense charges which are past due and unpaid will be immediately deducted from the Net Policy Value. If the Default Payment has not been paid by the end of the grace period, the policy will terminate. Upon termination of the policy, the remaining Net Cash Surrender Value, if any, will be paid to the Owner. If the Life Insured dies during the grace period, then we will deduct from the Death Benefit proceeds all Monthly Deductions due and unpaid as of the date of the Life Insured's death. No Insurance Benefit under the policy or any Supplementary Benefit riders will be in effect after the policy terminates.

**No-Lapse Guarantee**

If the policy is in the No-Lapse Guarantee Period, and the Cumulative Premium Test has been met, then one of the following will apply.

    (a)    During the first 2 Policy Years, the Base Face Amount, any Supplemental Face Amount, and any Supplementary Benefit riders will remain in effect.

    (b)    For the remainder of the No-Lapse Guarantee Period, if any (see Section 1 for the duration of the No-Lapse Guarantee Period), the Base Face Amount will remain in effect, but any Supplemental Face Amount and any Supplementary Benefit riders (unless otherwise stated therein) will be subject to termination. The amount required to maintain any Supplemental Face Amount and any applicable Supplementary Benefit riders is equal to the Default Payment specified above. If a payment at least equal to the Default Payment is not received by the end of the grace period, then any Supplemental Face Amount, and any Supplementary Benefit riders (unless otherwise stated therein), will cease to be in effect and will be terminated from the policy.

**Failure to Meet Cumulative Premium Test**

If the policy is in the No-Lapse Guarantee Period, and the Cumulative Premium Test has not been met, then the Base Face Amount, any Supplemental Face Amount, and any Supplementary Benefit riders may go into default, as described above. The Grace Period Duration and Default Payment provisions described above will apply. In lieu of the Default Payment, however, you may pay the shortfall needed to meet the Cumulative Premium Test, in which case one of the following will apply.

    (a)    During the first 2 Policy Years, the Base Face Amount, any Supplemental Face Amount, and any Supplementary Benefit riders will remain in effect;

    (b)    For the remainder of the No-Lapse Guarantee Period, if any, the Base Face Amount will remain in effect, but any Supplemental Face Amount and any Supplementary Benefit riders (unless otherwise stated therein) will terminate as of the end of the grace period.

The shortfall will be equal to the amount necessary to satisfy the Cumulative Premium Test as of the date of default, plus the No-Lapse Guarantee Premium for the next three Policy Months.

## 11. POLICY TERMINATION

This policy terminates on the earliest of the following events:

    (a)    the end of the grace period for which we have not received the amount necessary to bring the policy out of default;

    (b)    surrender of the policy for its Net Cash Surrender Value; or

    (c)    the death of the Life Insured.

## 12. REINSTATEMENT

If the policy terminates at the end of a grace period in which you did not make a required payment, the policy may be reinstated within 5 years from the date of default. The policy cannot be reinstated if it has been surrendered for its Net Cash Surrender Value.

The requirements for reinstatement are as follows:

    (1)    we must receive written request for reinstatement;

    (2)    we must receive evidence of insurability satisfactory to us for the Life Insured, and for any insureds covered under any Supplementary Benefit rider that you wish to reinstate;

    (3)    we must receive a premium equal to the amount that was required to bring the policy out of default immediately prior to termination, plus the amount needed to keep the policy in force to the next scheduled date for payment of the Planned Premium.

Requirements (2) and (3) must be satisfied within 60 days after the date we receive written request for reinstatement.

If we approve your request,

    (a)    the reinstatement date will be the date we receive the required payment at our Service Office;

    (b)    any Surrender Charge will be reinstated to the amount it was at the date of default;

    (c)    the remaining Surrender Charge Period, if any, will be the same as on the date of default;

    (d)    the Policy Value on the date of reinstatement, prior to the crediting of any Net Premium paid on the reinstatement, will be equal to the Policy Value on the date the policy terminated.

## 13. COVERAGE AT AND AFTER AGE 121

Coverage under this policy at and after the Life Insured's Age 121 is subject to the stipulations stated below.

**Death Benefit**
Any Supplemental Face Amount will be terminated, thereby reducing the Death Benefit by such amount. Apart from this change, the Death Benefit will be determined in the same respect as specified in Section 6.

**Premiums and Monthly Deductions**
We will not accept any further premium payments. We will cease to take Monthly Deductions for charges listed in Section 1.

**Credited Interest**
We will continue to credit interest monthly to the Fixed Account portion of the Policy Value.

**Policy Debt and Default**
Loan interest will continue to be charged if there is an outstanding loan when Monthly Deductions and premium payments cease at the Life Insured's Age 121 The policy will go into default at any time the Policy Debt exceeds the Policy Value, and Section 10, Grace Period, and Section 18, Loans, will apply.

**Withdrawals**
Withdrawals will be allowed at and after the Life Insured's Age 121.

**Loans**
Loans will be allowed at and after the Life Insured's Age 121.

# 14. POLICY VALUE

**Net Premiums Added**

When we receive your premium payments at our Service Office, we deduct a Premium Charge which will not exceed the amount shown in Section 1 and add the balance remaining (the Net Premium) to your Policy Value. We will do this before we take any deductions due on that Business Day.

For any premiums received prior to the Issue Date, we will credit interest at the rate of return then being earned on allocations to the current money market Investment Account, but will not deduct a Premium Charge. The Premium Charge will be deducted on the Issue Date, and the balance remaining will be your Policy Value from which deductions will be taken and to which any subsequent Net Premiums will be added.

Investment allocation of the initial premium payment and any subsequent premium payments will be in accordance with the Allocations provision of Section 17.

While a loan exists, we will treat the amounts you pay as premiums unless you request in writing that they be treated as loan repayments. If you instruct us to do so, we will first deduct from such payments the amount of accrued interest on loans and then deduct the amount specified as a loan repayment before applying any balance remaining as a premium payment.

**Monthly Deductions**

A deduction is due and will be taken from your Policy Value as of the Policy Date and as of each applicable Processing Date. Monthly Deductions are calculated from the Policy Date. If, at your request, we set the Policy Date to a date which precedes the date on which we receive the initial premium, Monthly Deductions due for the period prior to receipt of the initial premium will be taken on the later of the date we receive the initial premium and the date our underwriters approve issuance of this policy.

Unless we agree otherwise, or you do not have sufficient funds in an account, we will take Monthly Deductions from the Investment Accounts and the Fixed Account in the same proportion that the Policy Value in each of these accounts bears to the Net Policy Value immediately prior to the deduction.

Monthly Deductions are due until the Policy Anniversary on which the Life Insured reaches Age 121 at which time we will cease to take any further Monthly Deductions as described in Section 13.

The Monthly Deduction for any Policy Month that will be deducted from your Policy Value consists of charges (a) through (g) listed below, where:

- (a)  is the Asset-Based Risk Charge;
- (b)  is the Face Amount Charge, if any;
- (c)  is the Administrative Charge;
- (d)  is the sum of the charges for riders which are part of the policy, if any, provided such charges are deducted from the Policy Value and are not based on the Net Amount at Risk and are not a function of other components of the Monthly Deduction;
- (e)  is the sum of all charges for Additional Ratings, if applicable;
- (f )  is the Cost of Insurance Charge, as described below; and
- (g)  is the sum of the charges for riders which are part of the policy, if any, provided such charges are deducted from the Policy Value and are based on the Net Amount at Risk, or are a function of other components of the Monthly Deduction.

**Cost of Insurance Charge**

The rates for the Cost of Insurance Charge, as of the Policy Date and subsequently for each increase in Total Face Amount, are based on the Life Insured's sex, if applicable, Age, Risk Classification, Net Amount at Risk, and duration that the coverage has been in force.

The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount at Risk, including any Additional Ratings and any Supplementary Benefit riders which are part of the policy. The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions. The Maximum Monthly Rates at any age are shown in Section 2 as a rate per $1,000 of Net Amount at Risk. To get the maximum rate per dollar, the rate shown must be divided by 1,000. Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk.

The Cost of Insurance calculation will reflect any adjustment for the Minimum Death Benefit.

We review our Cost of Insurance rates from time to time, and may re-determine Cost of Insurance rates at that time on a basis that does not discriminate unfairly within any class of lives insured.

**Net Amount at Risk**

The Net Amount at Risk is the amount determined by subtracting (a) from the greater of (b) or (c) where:

- (a) is the Policy Value at the end of the immediately preceding Business Day less all charges due on the Policy Date or Processing Date;
- (b) (i) is the Total Face Amount divided by the Death Benefit Discount Factor shown in Section 1 for Death Benefit Option 1; or (ii) is the Total Face Amount divided by the Death Benefit Discount Factor shown in Section 1 plus the Policy Value for Death Benefit Option 2; and
- (c) is the amount defined in (a) multiplied by the applicable Minimum Death Benefit Factor for the Life Insured's Age as shown in Section 2.

**Other Deductions**

We will deduct a Surrender Charge, as detailed in Section 19, if during the Surrender Charge Period:

- (a) you surrender this policy for its Net Cash Surrender Value;
- (b) the Base Face Amount decreases;
- (c) you do not pay an amount due at the end of the grace period as described in Section 10, and your policy terminates.

## 15. LOAN ACCOUNT, FIXED ACCOUNT, INVESTMENT ACCOUNTS

The Policy Value at any time is equal to the sum of the values you have in the Loan Account, the Fixed Account, and the Investment Accounts.

**Loan Account Value**

The amount you have in the Loan Account at any time equals:

- (a) amounts transferred to it for loans and borrowed loan interest; plus
- (b) interest credited to it; less
- (c) amounts transferred from it for loan repayment.

For details regarding the Loan Account, see Section 18.

**Fixed Account Value**

The amount you have in the Fixed Account at any time equals:

- (a) Net Premiums allocated to it; plus
- (b) amounts transferred to it; plus
- (c) interest credited to it; less
- (d) amounts deducted from it; less
- (e) amounts transferred from it; less
- (f) amounts withdrawn from it.

We will determine the rate or rates of interest to be credited to the Fixed Account. Any additional interest will be credited no less frequently than annually. Additional interest is nonforfeitable after crediting. The rate or rates of interest will be determined prospectively and will be based on our expectations for the Fixed Account's future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve, and capital requirements, but in no event will the minimum credited interest be less than the Fixed Account Annual Rate shown in Section 1. The rate or rates of interest will be determined on a uniform basis for life insureds with the same timing and amount of premium, same amount of Policy Debt, and whose policies have been in force for the same length of time. For all transactions, interest is calculated from the date of the transaction.

## 15. LOAN ACCOUNT, FIXED ACCOUNT, INVESTMENT ACCOUNTS (continued

**Investment Account Value**

The amount you have in an Investment Account at any time equals the number of units in that Investment Account multiplied by the unit value of the corresponding Subaccount at that time.

The number of units in an Investment Account at any time equals (a) minus (b), where:

(a) is the number of units credited to the Investment Account because of:

(1) Net Premiums allocated to it; and

(2) amounts transferred to it; and

(b) is the number of units canceled from the Investment Account because of:

(1) amounts deducted from it;

(2) amounts transferred from it; and

(3) amounts withdrawn from it.

The number of units credited or canceled for a given transaction is equal to the dollar amount of the transaction, divided by the unit value on the Business Day of the transaction. See the Unit Value Calculation provision in Section 16 for details on how unit values are determined.

## 16. SEPARATE ACCOUNT AND SUBACCOUNTS

The Separate Account is authorized to invest in the shares of the John Hancock Trust and of other management investment companies. Each Subaccount of the Separate Account purchases shares of corresponding funds of a Series Fund of the John Hancock Trust or of other management investment companies.

The assets of the Separate Account are the property of the Company. They are used to support the Policy Values of variable life insurance policies. Income, gains, and losses of the Separate Account are credited to, or charged against, the Separate Account without regard to other income, gains and losses. The part of the assets that is equal to the Investment Account values in respect of all variable life insurance policies will not be charged with liabilities from any other business we conduct. We can transfer to our general account Separate Account assets in excess of the liabilities of the Separate Account arising under the variable life insurance policies supported by the Separate Account.

**Right to Make Changes**

We reserve the right to make certain changes if, in our judgment, they would best serve the interests of the owners of policies such as this or would be appropriate in carrying out the purposes of such policies. Any changes will be made only to the extent and in the manner permitted by applicable laws. Also, when required by law, we will obtain your approval of the changes and approval from any appropriate regulatory authority.

Examples of the changes we may make include the following:

(a) To operate a Separate Account in any form permitted under the Investment Company Act of 1940, or in any other form permitted by law.

(b) To take any action necessary to comply with or obtain and continue any exemptions from the Investment Company Act of 1940.

(c) To create new separate accounts, or to combine any two or more separate accounts including the Separate Account, or to de-register the Separate Account under the Investment Company Act of 1940, or to transfer assets between the Separate Account and other separate accounts.

(d) To transfer any assets in a Subaccount to another Subaccount, or to add, combine or remove Subaccounts.

(e) To substitute, for the investment company shares held in any Subaccount, another class of shares of the investment company or the shares of another investment company or any other investment permitted by law.

(f) To make any other necessary technical changes in this policy in order to conform with any action this provision permits us to take.

## 16. SEPARATE ACCOUNT AND SUBACCOUNTS (continued)

The investment policy of a Subaccount within the Separate Account shall not be materially changed unless a statement of the change is first filed with any jurisdiction requiring such a filing. In the event of such a change in investment policy, and while this policy is in force, you may elect a transfer to the Fixed Account as described in Section 17.

**Unit Value Calculation**
We will determine the unit values for each Subaccount as of the end of each Business Day.

The unit value for each Subaccount was established at $10 for the first Business Day that an amount was allocated, or transferred to the particular Subaccount. For any subsequent Business Day, the unit value for that Subaccount is obtained by multiplying the unit value for the immediately preceding Business Day by the net investment factor for the particular Subaccount on such subsequent Business Day.

**Net Investment Factor**
The net investment factor for a Subaccount on any Business Day is equal to (a) divided by (b) where:

    (a)    is the net asset value of the underlying Fund shares held by that Subaccount as of the end of such Business Day before any policy transactions are made on that day; and

    (b)    is the net asset value of the underlying Fund shares held by that Subaccount as of the end of the immediately preceding Business Day after all policy transactions were made for that day.

We reserve the right to adjust the above formula for any taxes determined by us to be attributable to the operations of the Subaccount.

## 17. ALLOCATIONS AND TRANSFERS

**Allocations**
We process Net Premiums as described in Section 14. Any Net Premium credited to the Policy Value prior to the Allocation Date, as shown in Section 1, will automatically be invested in the current money market Investment Account. On the Allocation Date (or on the date such Net Premium is received, if later), we will reallocate the amount in the current money market Investment Account attributable to any such Net Premium in accordance with the allocation instructions then in effect. We will allocate all other Net Premiums and credits to the Fixed Account and to any Investment Accounts in accordance with the allocation instructions then in effect. Initial allocation instructions are elected in your application for this policy. With regard to the first and subsequent Net Premiums, we reserve the right to limit the dollar amount that may be allocated to any Investment Account or Fixed Account.

You may elect to change your allocation instructions at any time. A change can be elected by written request or by any telephone or internet notification if a currently valid written authorization to make changes in this manner is on file with us. A change will be effective as of the end of the Business Day on which we receive notice satisfactory to us. Instructions to us must express allocation percentages as greater than or equal to zero and less than or equal to 100%, and the sum of the allocation percentages must equal 100%. Allocation percentages must be whole numbers.

The date for allocation percentage changes will be as of the end of the Business Day on which we are contacted, as described above, to make the changes. We reserve the right to impose a limit on the number and frequency of such changes and to set minimum and maximum percentages that may be allocated to any Investment Account and the Fixed Account.

**Transfers**
In the same way as described above in the Allocations provision, instructions may be given to us at any time while the policy is in force to transfer portions of your Policy Value among the Investment Accounts and the Fixed Account. Transfers are subject to the restrictions described below.

**General Restrictions on Transfers**

You can make up to 2 transfers per calendar month. You can transfer 100% of the Policy Value to the current money market Investment Account after this limit has been reached. If such transfer to the current money market Investment Account is made, no subsequent transfers from the current money market Investment Account to another Investment Account may be made within 30 days.

There is no charge for the first 12 transfers in any Policy Year. If you make more than 12 transfers in any Policy Year, a transfer fee not to exceed the Maximum Transfer Fee shown in Section 1 will apply to each subsequent transfer in the Policy Year. We will consider all transfer requests made on the same day as one transfer. Transfers made pursuant to the Asset Allocation Balancer or Dollar Cost Averaging options described below are not subject to the foregoing general restrictions. Without our approval, the maximum amount that may be transferred to or from an Investment Account in any Policy Year may not exceed the Investment Account Maximum Transfer Amount shown in Section 1.

We and the John Hancock Trust reserve the right to impose additional restrictions to restrict short-term trading. Additional restrictions that may be imposed regarding transfers include, but are not limited to restricting:

(a) the number of transfers made during a defined period;

(b) the dollar amount of transfers;

(c) the method used to submit transfers; and

(d) transfers into and out of certain Investment Accounts.

We or the John Hancock Trust may terminate transfer privileges at any time.

**Restrictions on Transfers to the Fixed Account**

You may transfer the Policy Value from any of the Investment Accounts to the Fixed Account without incurring any transfer charges, regardless of the number of transfers previously made, provided such transfers occur:

(a) within 18 months after the Issue Date, as shown in Section 1; or

(b) within the later of (i) or (ii) where (i) is 60 days from the effective date of a material change in the investment objectives of the Subaccount, from which the Policy Value will be transferred, and (ii) is 60 days from the notification date of such change.

**Restrictions on Transfers out of the Fixed Account**

The maximum amount that you can transfer out of the Fixed Account in any one Policy Year is limited to the greater of:

(a) the Fixed Account Maximum Transfer Percentage shown in Section 1 multiplied by the value in the Fixed Account at the previous Annual Processing Date; and

(b) the Fixed Account Maximum Transfer Amount shown in Section 1.

Any transfer out of the Fixed Account may not involve a transfer to the current money market Investment Account.

**Asset Allocation Balancer Transfers**

If you elect this option, we will automatically transfer amounts among your specified Investment Accounts in order to maintain your designated percentage in each account. We will effect the transfers 6 months after the Policy Date and each 6 month interval thereafter. When you change your premium allocation instructions, your Asset Allocation Balancer will change so the two are identical. This change will automatically occur unless you instruct us otherwise, or a Dollar Cost Averaging request is in effect. We reserve the right to cease to offer this option as of 90 days after we send you written notice.

## 17. ALLOCATIONS AND TRANSFERS (continued)

**Dollar Cost Averaging Transfers**

If you elect this option, we will automatically transfer amounts each month from one Investment Account to one or more of the other Investment Accounts or the Fixed Account. You must select the amount to be transferred and the accounts. If the value in the Investment Account from which the transfer is being made is insufficient to cover the transfer amount, we will not effect the transfer and we will notify you. We reserve the right to cease to offer this option as of 90 days after we send you written notice.

## 18. LOANS

At any time while this policy is in force and sufficient loan value is available, you can get a loan by written request. Each loan must be for at least the Minimum Loan Amount shown in Section 1. We may require a loan agreement from you as the policy is the only security for the loan. We may defer loans as provided by law or as provided in Section 26. Loans, except those used to pay premiums on policies with us, may not be made if the policy is in the Grace Period as described in Section 10.

**Available Loan Value**

The available loan value on any date will be an amount equal to (i) the Net Cash Surrender Value, less (ii) the Monthly Deductions then being deducted from the Policy Value multiplied by the number of months remaining in the Policy Year, less (iii) an amount determined as follows:

- (a) Deduct (ii) above from (i) above.
- (b) Multiply the result by the difference between the effective annual rate then being charged on loans and the effective annual rate then being credited on the Loan Account.

In no event, however, will the available loan value be less than 90% of the Net Cash Surrender Value. Values will be determined, subject to Section 26, as of the end of the Business Day on which the loan application is received at our Service Office.

**Loan Account**

When you take out a loan, or when loan charges are borrowed, we will transfer amounts from the Fixed Account and the Investment Accounts, as applicable, into the Loan Account. Amounts we transfer into the Loan Account cover the loan principal. A Loan Subaccount exists for each Investment Account and for the Fixed Account. Amounts transferred to the Loan Account are allocated to the appropriate Loan Subaccount to reflect the account from which the transfer was made. We will allocate the amounts to be transferred in the same proportion that your value in the Subaccounts bears to the new Policy Value, unless you request otherwise, and our then current rules allow you to designate different proportions. When an amount to be transferred is allocated to an Investment Account, we will redeem units of that Investment Account sufficient in value to cover the allocated amount. These transfers do not count as a transfer for the purposes of the Transfer provisions described in Section 17.

Interest is credited to the Loan Account and interest is also charged on the Policy Debt, as described in the Loan Interest Charged and the Loan Interest Credited provisions.

**Loan Interest Charged**

Interest will accrue daily on loans. Loan interest will be payable on each Annual Processing Date and on the date the loan is settled. Interest may be paid in advance at the equivalent effective rate. In the event that you do not pay the loan interest charged in any Policy Year, it will be borrowed against the policy and added to the Policy Debt in arrears at the Policy Anniversary. We will allocate the amount borrowed for interest payment in the same proportion that your value in the Fixed Account and the Investment Accounts bears to the Net Policy Value as of the Policy Anniversary.

MV1706A

## 18. LOANS (continued)

The effective loan interest charged rate will not exceed the Maximum Loan Interest Charged Annual Rate shown in Section 1. We will increase the Loan Interest Charged Annual Rate at any time it is determined that the rate being charged would cause a loan to be taxable under any applicable ruling, regulation, or court decision. In such case, we will increase the Loan Interest Charged Annual Rate to an amount that would result in the transaction being treated as a loan under federal tax law.

Loan interest will continue to be charged, as described in Section 13, when Monthly Deductions and premium payments cease at the Life Insured's Age 121.

**Loan Interest Credited**

Loan interest will accrue daily to amounts in the Loan Account. The effective loan interest rate credited is the difference between the effective loan interest rate charged and the Loan Interest Credited Differential. The difference, in terms of dollars, is the cost of keeping a loan. The differential will not exceed the Maximum Loan Interest Credited Differential shown in Section 1.

**Loan Repayment**

You may repay the Policy Debt in whole or in part at any time prior to the death of the Life Insured and while the policy is in force. When you make a loan payment or repay a loan, we credit the amount remaining after deduction of the loan interest charges, specified above, to the Loan Account, and make a transfer to the Fixed Account and the Investment Accounts, as applicable.

Upon loan repayment, the same proportionate amount of the entire loan as was borrowed from the Fixed Account will be repaid to the Fixed Account. The remainder of the loan repayment will be allocated to the appropriate Investment Accounts in accordance with the allocation instructions then in effect (unless our then current rules allow you to designate a different allocation with your repayment and you in fact do so).

Subject to any rider, endorsement, or other provisions, while a loan exists, we will treat any amounts you pay as premiums, unless you request in writing that they be treated as loan repayments. However, when a portion of the Loan Account is allocated to the Fixed Account, we reserve the right, where permitted by state law, to require that premium payments be applied as loan repayments.

## 19. SURRENDERS AND WITHDRAWALS

**Surrender of the Policy**

You may surrender this policy upon written request for its Net Cash Surrender Value at any date prior to the death of the Life Insured. We will determine the Net Cash Surrender Value as of the end of the Business Day on which we have received at our Service Office your written request for full surrender of the policy (the "Surrender Date"). We will process the request and pay the Net Cash Surrender Value only if we have not received due proof that the Life Insured died prior to the Surrender Date. After we receive your written request to surrender the policy, no insurance will be in force. If you surrender the policy during the Surrender Charge Period, we will deduct a Surrender Charge from your Policy Value in calculating the Net Cash Surrender Value. The Surrender Charge and Surrender Charge Period are shown in Section 1.

**Withdrawals**

Once per Policy Month after the first Policy Anniversary, you may request a withdrawal of part of the Net Cash Surrender Value if available. For each withdrawal we reserve the right to deduct a Withdrawal Fee as shown in Section 1. Withdrawals are subject to the following conditions:

(a) without our approval, each withdrawal must be for at least the Minimum Withdrawal Amount shown in Section 1;

(b) after the withdrawal, the remaining Net Cash Surrender Value must be at least equal to 3 times the Monthly Deductions at the time of the withdrawal;

(c) we will process the withdrawal, thereby reducing the Policy Value, as of the end of the Business Day on which we receive your written request;

(d) we will deduct a pro-rata Surrender Charge if the withdrawal occurs during the Surrender Charge Period, and the withdrawal results in a reduction in Base Face Amount;

(e) we will reduce the amount of the withdrawal if the amount in all accounts is not sufficient to pay the withdrawal plus the Withdrawal Fee and any pro-rata Surrender Charge;

(f) you may specify which Investment Accounts as well as the Fixed Account from which we should make the withdrawal. If we do not receive such instructions, we will allocate the deduction of the withdrawal and any pro-rata Surrender Charge in the same proportion that the value in the Fixed Account and the Investment Accounts bears to the Net Policy Value; and

(g) we will reduce the amount of the withdrawal if it would otherwise cause the Base Face Amount to fall below the Minimum Base Face Amount shown in Section 1.

If Death Benefit Option 1 is in effect at the time of the withdrawal, the Total Face Amount of the policy will be reduced:

(a) by the amount of the withdrawal, if at the time of the withdrawal the Death Benefit equals the Total Face Amount; otherwise

(b) by the amount, if any, by which the withdrawal (including any applicable pro-rata Surrender Charge and withdrawal fee) exceeds the difference between the Minimum Death Benefit and the Total Face Amount, divided by the applicable Minimum Death Benefit Factor for the Life Insured's Age as shown in the Table of Rates in Section 2.

Withdrawals will generally reduce the Supplemental Face Amount first, and then the Base Face Amount. We reserve the right to allow a reduction in Base Face Amount prior to fully reducing the Supplemental Face Amount. If the Death Benefit on any given day is equal to the Policy Value times the applicable Minimum Death Benefit Factor, withdrawals on such day will reduce the Death Benefit by the amount withdrawn times the applicable Minimum Death Benefit Factor until the Death Benefit is equal to the Total Face Amount. Your Death Benefit will continue to be determined in accordance with Sections 6 and 13, subject to these provisions.

If Death Benefit Option 2 is in effect, an amount equal to any withdrawal and Withdrawal Fee will be deducted from the Policy Value. Withdrawals will not affect the Total Face Amount. Your Death Benefit will continue to be determined in accordance with Sections 6 and 13.

## 20. OWNER AND BENEFICIARY

Until the Life Insured's death, without the consent of any revocable beneficiaries, you can receive any amount payable under the policy and exercise all rights and privileges granted by the policy.

**Change of Owner**
Until the Life Insured's death, the owner can change the ownership of the policy by written request. The change will take effect as of the date you signed the written request. It will not apply to any payments we made or any action we may have taken before we received your written request.

**Trustee Owner**
Should the owner be a trustee, payment to the trustee(s) of any amount to which the trustee(s) is (are) entitled under the policy, either by death or otherwise, will fully discharge us from all liability under the policy to the extent of the amount so paid.

**Joint Ownership**
Two or more owners will own the policy as joint tenants with right of survivorship, unless otherwise requested on the application or in any subsequent assignment of the policy. On death of any of the owners, the deceased owner's interest in the policy passes to the surviving owner(s).

**Successor Owner**
Upon the owner's death during the Life Insured's lifetime, a named successor owner will, if then living, have all the owner's rights and interest in the policy. Until the Life Insured's death, the owner, without the consent of any beneficiary or any successor owner, can cancel or change the designation of successor owner. This may be done from time to time by agreement in writing with us.

## 20. OWNER AND BENEFICIARY (continued)

The following four provisions will apply unless there is a beneficiary appointment in force that provides otherwise.

**Beneficiary Classification**

You can appoint beneficiaries for the Insurance Benefit in three classes: primary, secondary, and final. Beneficiaries in the same class will share equally in the Insurance Benefit payable to them.

**Payment To Beneficiaries**

We will pay the Insurance Benefit:

    (a)    to any primary beneficiaries who are alive when the Life Insured dies; or

    (b)    if no primary beneficiary is then alive, to any secondary beneficiaries who are then alive; or

    (c)    if no primary or secondary beneficiary is then alive, to any final beneficiaries who are then alive.

**Change Of Beneficiary**

Until the Life Insured's death, you can change the beneficiary by written request unless you make an irrevocable designation. We are not responsible if the change does not achieve your purpose. The change will take effect as of the date you signed such request. It will not apply to any payments we made or any action we may have taken before we received your written request.

**Death Of Beneficiary**

If no beneficiary is alive when the Life Insured dies, the Insurance Benefit will be payable to you; or if you are the Life Insured, to your estate. Unless otherwise provided, if a beneficiary dies before the seventh day after the death of the Life Insured, we will pay the Insurance Benefit as if the beneficiary had died before the Life Insured.

## 21. ASSIGNMENT

Your interest in this policy may be assigned without the consent of any revocable Beneficiary. Your interest, any interest of the Life Insured and of any revocable Beneficiary shall be subject to the terms of the assignment, but such assignment shall not affect the interest of any irrevocable Beneficiary.

We will not be on notice of any assignment unless it is in writing, nor will we be on notice until a duplicate of the original assignment has been filed at our Service Office. We assume no responsibility for the validity or sufficiency of any assignment.

## 22. MISSTATEMENTS

If the age or sex of the Life Insured was misstated in the application, we will, if necessary, change the Base Face Amount, any Supplemental Face Amount, and every other benefit to that which would have been purchased at the correct age or sex by the most recent Cost of Insurance Charge.

## 23. SUICIDE

If the Life Insured commits suicide, while sane or insane, within 2 years from the Issue Date, the policy will terminate on the date of such suicide and we will pay (in place of all other benefits, if any) an amount equal to the premiums paid less the amount of any Policy Debt on the date of death and less any withdrawals.

If the Life Insured commits suicide, while sane or insane, after 2 years from the Issue Date and within 2 years from:

    (a)    the date we approve a schedule of increasing Supplemental Face Amount;

    (b)    the effective date of any unscheduled increase in Supplemental Face Amount; or

    (c)    the date of an increase in Death Benefit resulting from any payment of premium we are authorized to refuse under Section 4

the benefits payable under the policy will not include the amount of such Death Benefit increase but will include the amount of premium that pertains to the increase.

We reserve the right under this provision to obtain evidence of the manner and cause of death of the Life Insured.

However, when the policy is issued to a Missouri citizen, suicide is no defense to payment of life insurance benefits nor is suicide while insane a defense to payment of accidental death benefits, if any, under this policy unless we can show that the Life Insured intended suicide when the policy was applied for.

## 24. INCONTESTABILITY

This policy shall be incontestable after it has been in force during the lifetime of the Life Insured for two Policy Years from the earlier of the Policy Date or the Issue Date, except for fraud or policy termination, or any provision for reinstatement or policy change requiring evidence of insurability.

In the case of reinstatement or any policy change requiring evidence of insurability, the incontestable period shall be two years from the effective date of such reinstatement or policy change. However, for a policy change involving the approval of a schedule of increasing Supplemental Face Amount, the incontestable period shall be two years from the date we approve such schedule.

Any premium payment which we accept subject to insurability, and any increase in the Death Benefit resulting from such payment, shall be considered a policy change for purposes of this Section.

## 25. THE CONTRACT

The written application for the policy is attached at issue. The entire contract between the applicant and us consists of the policy, such application, and any riders and endorsements. However, additional written requests or applications for policy changes or acceptance of excess payment may be submitted to us after issue and such additional requests may become part of the policy. No insurance representative has authority to waive a complete answer to any question in the application, pass on insurability, make or amend any contract or waive any of our rights or requirements. All statements made in any application shall, in the absence of fraud, be deemed representations and not warranties. We will use no statement made by or on behalf of the Life Insured to defend a claim under the policy unless it is in a written application.

An exchange of this policy for a new policy on a different plan may be made by agreement between you and us in accordance with our published rules in effect at that time.

We reserve the right to make any changes necessary in order to keep this policy in compliance with any changes in federal or state tax laws. Other changes in this policy may be made by agreement between you and us. Only the President, Vice President, the Secretary, or an Assistant Secretary of the Company has authority to waive or agree to change in any respect any of the conditions or provisions of the policy, or to extend credit or to make an agreement for us.

## 26. RIGHT TO POSTPONE PAYMENT OF BENEFITS

We reserve the right to postpone the payment of Net Cash Surrender Values, withdrawals, policy loans, and the portion of the Insurance Benefit that depends on Investment Account values, for any period during which:

(a)    the New York Stock Exchange is closed for trading (other than customary week-end and holiday closings), or trading on the Exchange is otherwise restricted;

(b)    an emergency exists as defined by the Securities and Exchange Commission (SEC), or the SEC requires that trading be restricted; or

(c)    the SEC permits a delay for the protection of policyholders.

We also reserve the right to postpone payments, including loans, for up to 6 months if such payments are based on values that do not depend on the investment performance of the Investment Accounts.

In addition, we may deny transfers under the circumstances stated in (a), (b) and (c) above, and in the Allocations and Transfers provision.

## 27. CLAIMS OF CREDITORS

The proceeds and any income payments under the policy will be exempt from the claims of creditors to the extent permitted by law. These proceeds and payments may not be assigned or withdrawn before becoming payable without our agreement.

## 28. REPORTS TO OWNER

Within 30 days after each Policy Anniversary, we will send you a report at no charge showing:

(a)    the Death Benefit;

(b)    the Policy Value;

(c)    the current allocation in the Fixed Account, the Loan Account, and each of the Investment Accounts;

(d)    the value of the units in each chosen Investment Account;

(e)    the Loan Account balance and loan interest charged since the last report;

(f )    the premiums paid and policy transactions for the year; and

(g)    any further information required by law.

Upon request, we will provide you with a report of projected future values. We will provide one report annually without charge. For additional reports you request, we reserve the right to charge a reasonable fee, not to exceed $50.

## 29. HOW VALUES ARE COMPUTED

We provide Cash Surrender Values that are at least equal to those required by law. We base minimum Cash Surrender Values on the Commissioners 2001 Standard Ordinary Sex Distinct ANB Aggregate Ultimate Mortality Tables, with substandard ratings as applicable. However, if this policy is issued on a unisex basis, we base minimum Cash Surrender Values on the Commissioners 2001 Standard Ordinary Male Mortality Table, with substandard ratings as applicable. We also use these tables in determining Guaranteed Maximum Cost of Insurance Charges. Reserves will be at least as great as the minimum required by law.

A detailed statement of the method of computing the values of this policy has been filed with the insurance department of the state shown in Section 1.

Communications about this policy may be sent to the Company's Service Office, which is currently at [197 Clarendon Street, Boston, Massachusetts 02117.  Our toll-free number is 1-800-521-1234].

Flexible Premium Variable Life Insurance policy
Death Benefit payable at death of Life Insured
Not eligible for dividends
Benefits, Premiums, and the Risk Classification are shown in Section 1.